APRIL TERM, 1859, AT OTTAWA.

21 375
24a 375
21 375
31a 594

21 375
147 300

21 375
45a 463
21 375
187 5258

21 375
209 6289

---

HENRY JUMPERTZ, Plaintiff in Error, *v.* THE PEOPLE, Defendants in Error.

### ERROR TO COOK.

The genuineness of hand-writing cannot be proved or disproved, by allowing the jury to compare it with other writing of the party, proved or admitted to be genuine.

The practice of experiments in a capital case before the jury, for the purpose of illustrating whether a deceased person could commit suicide by hanging upon a screw or hook, inserted in a door, and leaving the door so experimented upon to be exhibited to the jury during the recess of the court, should be permitted with great caution.

It is irregular for the counsel for the people to introduce testimony in chief, in a capital case, to show that the person murdered, was of a cheerful and healthy condition of mind, and not inclined to commit suicide; although the counsel for the prisoner had stated that their line of defense would be to establish such inclination; such testimony should have been offered as rebutting, after the case for the defense had been closed.

A court should admit proof of the declarations of a murdered person, intended to show the sanity of such person, under great precaution, in order to avoid improper influences upon the jury.

If a juror sworn in a capital case is permitted to be separated from his fellows, a special order authorizing the separation should be entered of record, and the juror placed in the charge of an officer, who should be specially sworn not to permit the juror to go out of his sight and hearing; he should also be sworn not to converse with him about the trial himself, or permit others to do so, and to cause the juror to return as soon as practicable.

In a capital case, the jury should not be permitted to separate; if they do, it will be a ground for a new trial, unless it is made to appear that the prisoner could not by any possibility have been prejudiced by the separation.

Jurors impanneled in such a case, should not be permitted to eat with others at the public table of an hotel.

THIS was an indictment for the murder of Sophie Werner. The bill was found in the Cook Circuit Court, at the June special term thereof, A. D. 1858. The prisoner, Jumpertz, was arraigned, and plead not guilty, and the cause was continued. In September following, the indictment was certified by the clerk of the Circuit Court, to the Cook County Court of Common Pleas. In November of the same year, said indictment, with a transcript of the record of the proceedings in the Common Pleas, was refiled in the Circuit Court, which record is substantially as follows:

At a regular term of said Cook County Court of Common Pleas, commenced on the second Monday, (being the 13th of September,) in the year 1858, and on the 20th day of September, in said term, the following proceedings in said cause were had:

THE PEOPLE OF THE STATE OF ILLINOIS, ⎱
    vs.                                ⎰  *Indictment for Murder.*
HENRY JUMPERTZ.

And now on this day came the said People by Carlos Haven, their attorney, and on his motion, it is ordered that this cause be continued to next term.

That afterwards, the said cause stood for trial at the regular trial term of the said Circuit Court, in November, 1858. That at the trial term last aforesaid, the said Circuit Court continued the said cause, with all the other criminal business, until the January term, 1859—a term specially called for criminal business.

That at the time of the said last continuance of the said cause, neither the prisoner nor his counsel were present, nor had at the time any knowledge of the order.

And afterwards, on the 6th day of January, 1859, the said defendant filed in the said court his motion, in writing, as follows, to wit:

THE PEOPLE OF THE STATE OF ILLINOIS, ⎱
    vs.                                ⎰  *Indictment for Murder.*
HENRY JUMPERTZ.

The defendant, Henry Jumpertz, moves the court:

1st. To set him at liberty, and discharge him from further imprisonment under said prosecution, etc.

2nd. To set him at liberty, and discharge him from further prosecution on the indictment against him for the murder of Sophie Werner.

And assigns the following reasons:

That he has been imprisoned on said charge since 26th of May, 1858.

That said cause was put at issue at the June term, 1858. That at the said June term of this court, and at the regular

September term of the Cook County Court of Common Pleas, in same year, the said cause was continued, on the motion of the prosecuting attorney, on behalf of the People; and that the same stood for trial at the November term of this court, 1858, but was continued, and that all of such continuances were without the consent of the defendant. That three terms of said courts, at either and each of which said defendant might have been tried, had passed without his having been tried, and without his, said defendant, having moved for or consented to any continuance, during all of which time he had been imprisoned without bail.

And on the hearing of the said motion, the said defendant, by his attorney, and the said Carlos Haven, in behalf of the People, filed their written stipulation, in the words and figures following, to wit: " That the defendant, Henry Jumpertz, was arrested in May, 1858 ; that he was indicted, and pleaded thereto at the June term of the Cook County Circuit Court, 1858; that the cause was continued on motion of the People's attorney, at the said term, in opposition to the request of the prisoner; that the cause was then transferred to the Cook County Court of Common Pleas, and was called for trial at the regular September term thereof, in 1858, and was then again continued, against the request of the said defendant, and on motion of the said attorney for the People, and then the cause was transferred back to the said Circuit Court, and stood for trial at the regular trial term thereof, in November, 1858.

That at the regular trial term last aforesaid, the said Circuit Court continued the said cause, with all the other criminal business, until the January term, 1859—a term specially called for the criminal business. That at the time of the last said continuance of the cause, neither the prisoner nor his counsel were present, nor had at the time it was made, any knowledge of the order ; but that they learned soon after, and during the term, that such continuance had taken place, and expressed to the court no dissatisfaction with said order.

(Signed,)        CARLOS HAVEN, *State Attorney.*
                 E. W. McCOMAS, *Counsel for Prisoner.*

And the said McComas and Haven then and there presented said stipulation to the court, and agreed that said facts were true, and that they, together with the record in the case, should be in evidence before the court on the hearing of said motion.

And thereupon the said court overruled the said motion ; to which opinion and decision of the court overruling the said motion, the said defendant, by his counsel, excepted, etc.

And afterwards, to wit: On the 11th day of the month and

year last aforesaid, the said People filed in the said court, a written motion, in the words and figures following, to wit:

PEOPLE,       }      Indictment for Murder—January 9, 1859.
   vs.        }   To HENRY JUMPERTZ, Defendant;
JUMPERTZ.     }   McCOMAS & VAN BUREN, Defendant's Counsel.

Gentlemen—Please to take notice: That the People will call, on the trial of the above cause, the following witnesses, whose names are not on the indictment, to wit: Minna Kacher, August Herzberg, Catherine Herzberg, Eliza Raabe, Frederick W. Raabe, Anna Dapus, Elizabeth Dapus, Minna Feitenhamer, Edward Vallert, and Nicholas Kessler, Milwaukee.

And afterwards, to wit: On the 24th day of the month and year aforesaid, at the January term of said court, the following proceedings were had in said cause: The said defendant comes and moves the court, on affidavits filed, for a continuance of said cause, which affidavits are as follows:

PEOPLE OF THE STATE OF ILLINOIS,  }   Indictment for Murder.
                vs.               }   January Special Term.
         HENRY JUMPERTZ.          }

Henry Jumpertz, being duly sworn, says: That he is defendant in said cause; that he was imprisoned in May, 1858; that the indictment was found at the June term of said year, at which term he in good faith urged for his trial.

That the said cause again stood for trial at the September term of the Cook County Court of Common Pleas, when defendant again urged for a trial, but the cause was continued. That said cause again stood for trial at the November term of this court, and was again continued without affiant's consent or knowledge. That owing to his imprisonment, affiant has had to rely solely on the assistance of his counsel, and that he, and as he believes his counsel, were ignorant that a special term was to be held in January, 1859, for the trial of said cause, or that said court had a right to postpone the said trial to any time during said term. The affiant has no means in his hands to procure witnesses; that all the property he has, has been taken from him by the officers, at his arrest, and has been only partially restored, and that within a few days past.

That just previous to the last visit of the deceased, Sophie Werner, to Chicago, affiant received a letter from her, which, he is advised, will greatly aid in his acquittal. That said letter was taken from affiant's possession, when he was first arrested, and has ever since been kept by the prosecution.

That affiant's counsel, soon after his arrest, applied to the officer who had it, to permit him, said counsel, to see it; which was refused. That at length, on the 18th day of January last, for the first time, the said letter was, by order of the court, placed in possession of the sheriff; and that immediately there-

after, affiant's counsel, accompanied by said sheriff with said letter, proceeded to Milwaukee, where the deceased had lived, to search for witnesses who knew the hand-writing of the deceased by whom to prove said letter; and did not return until Friday last; and that the said sheriff did not return with the letter until Saturday last; and that immediately on his, said sheriff's, return, affiant's counsel went forthwith to various persons in Chicago, who knew Sophie Werner, to find proof of her hand-writing. That on the eleventh day of January, 1859, defendant's counsel was served with a notice of a large number of additional witnesses, and with a notice of two others to-day, which the prosecution would examine on the trial, among whom were a number from Milwaukee.

That until this notice, it was not known that the prosecution would attempt to impeach or discredit the letter, or that said Milwaukee witnesses were to be used. That a subpœna has been issued for J. Weglehner and wife, and sent to Grundy county. That his counsel, as he is informed and believes, has been unable to see several persons in Chicago, whom he believes would testify to the hand-writing of Sophie Werner, for want of time to do so since the return of the sheriff with said letter.

That, as affiant is informed by his counsel, he can prove by a Mrs. Davis that said Sophie Werner was of a most desponding temper, and expressed to her her conviction that she should not be long in this world. That said Mrs. Davis lives in Milwaukee, and expresses her readiness to come and testify on his trial, but has just been confined in child-bed and cannot leave her room. And defendant believes he can procure the attendance of said witness at the next term of said court. That he is advised by his counsel, and believes that the testimony of said witness is most material and necessary for him in his defense, and that he cannot safely go to trial without it.

That the prosecution, as he is advised and believes, have made elaborate preparation, while he has been compelled to remain in ignorance of the proof to be brought against him.

(Signed,)        HENRY JUMPERTZ.

THE PEOPLE,
    vs.            }   *Indictment for Murder.*
HENRY JUMPERTZ. }

E. W. McComas, being sworn, etc., says: The moment the letter mentioned in the affidavit of defendant filed in this cause was given to the sheriff of said county, under the order of the court, he went with said sheriff and said letter to Milwaukee, and in company with said sheriff examined and conversed with several witnesses and persons in relation to the alleged crime

of defendant, and among others, Mrs. Eliza Raabe, Minna Kacher and a Mrs. Davis. These were the names they gave.

That they all expressed a willingness to attend the trial, and agreed to do so positively if it were possible, but rendered the following excuses respectively:

Mrs. Davis had just been confined, and was unable as yet to come, the evidence of which was present and manifest to affiant as well as others. Said Mrs. Davis stated to affiant in substance that Sophie Werner was of a desponding temper, and spoke of not expecting to live long.

(Signed,)      E. W. McCOMAS.

Thereupon, the court, after continuing the said cause until the following day, upon the attorney for the State informing the said court that he had heard from the said witness and others mentioned in said affidavits, and should be able to, and would procure their attendance on the trial, the said court overruled and denied the said motion; but remarked that if the attorney for the People should not procure said witnesses, he would consider their absence and his failure to produce them on a motion for a new trial on the ground of surprise.

To which ruling and opinion of the court overruling said motion, the said defendant excepted.

And afterwards, on the 26th day of January, in the year last aforesaid, it was ordered that a jury come, etc., whereupon a jury came, etc., and were duly elected, tried and sworn, etc., to try said cause. And the court being about to adjourn till the following day, it is ordered that the sheriff or some other officer of the court take charge of the jury and keep them together, etc.

Afterwards, on the 27th day of said January, the People by their attorney, and the prisoner, in person and by his counsel, being present, the testimony was commenced and continued from day to day, until the 2nd day of February, when the evidence was closed, and the argument of the said cause was commenced, and continued until the 5th day of February, when the argument was closed.

On the 5th day of February, the argument of counsel being closed, and the jury, having heard the instructions of the court, retired to consider of their verdict, and returned a verdict of *guilty*.

Whereupon the said defendant, by his counsel, moves the court for a new trial and in arrest of judgment.

Which motions were entered of record, and the cause was continued to the next term of the court for hearing.

And afterwards, to wit: on the 20th day of February, A. D.

1859, the said defendant, by his counsel, filed in the court aforesaid his motion for a new trial of said cause as follows:

The defendant, Henry Jumpertz, moves the said court to set aside the verdict of the jury in said cause, and award a new trial therein, for the following, among other reasons:

1st. Because the court never acted on or decided the motion to quash the indictment.

2nd. The defendant never plead to the indictment, nor was called on to do so.

3rd. On account of the absence of Mary Fisher, a witness, as shown in affidavit.

4th. On account of the absence of the witness, Theobold, at the trial, as shown by affidavit.

5th. Because the jury were not kept together, but were permitted to separate.

6th. Because one or more of the jury did separate from their fellows, without being in charge of an officer, and were conversed with by persons not of the jury, and about the cause.

7th. Because the verdict was against the evidence in the cause.

8th. Because the court permitted illegal evidence to go to the jury, to wit: The statements and declarations of Sophie Werner, deceased, made to different persons, between the time the prisoner left Milwaukee—December, 1857—and the time when said Sophie Werner left Milwaukee, on or about 3rd of March following.

*Second*, The statements of Sophie Werner, of the contents of Jumpertz's letters to her.

*Third*, The court permitted and directed experiments to be made with door, hooks, etc.

*Fourth*, Also, that another door was exhibited to the jury, with hooks in it, broken or bent down, both in and out of court.

*Fifth*, The court permitted a receipt, purporting to be signed by Sophie Werner, to be given in evidence, for the sole purpose of enabling the jury to judge of the hand-writing of said Sophie, by comparison.

9th. The court permitted a mass of evidence to go to the jury, consisting of statements of Sophie Werner; and then, at the close of the trial, instructed them that it was only to be considered as evidence of her state of mind.

10th. The court misdirected the jury.

11th. The court refused to grant motion for continuance.

12th. Same in substance.

13th. The officers who had charge of the jury were not sworn.

14th. Because the State attorney was allowed to argue the guilt of the prisoner, from his countenance, demeanor, and because he did not believe in a God.

In support of which motion, the defendant filed in said court the following affidavits:

Henry Jumpertz, the said defendant, being duly sworn, etc., says: Ever since the finding of the indictment in said cause, E. W. McComas has been his counsel, and that being closely confined to jail, he has been compelled to depend solely on his said counsel to find and procure the attendance of his witnesses. That he is informed and believes that his counsel saw and conversed with one Theobold, in Milwaukee, who stated to said McComas that he would testify, just before Sophie Werner left Milwaukee she spoke to him in a most desponding tone, and said she would not be long in the world, etc. That said Theobold promised to come and attend said trial, if sent for.

That one Kennedy was sent for the Milwaukee witnesses, with money to pay their fees and expenses, and that in the hurry of his departure he did not procure a full list of said McComas, and the name of said Theobold was accidentally omitted, and he was not obtained.

And that said Kennedy did not return till the evening before the evidence in said cause was closed, when it was too late to obtain said witness.

That he is informed, and belives that one Mary Fisher stated to his said counsel before the trial that she would swear that she knew Sophie Werner, and was well acquainted with her; and that one Sunday morning in the month of March, between nine and ten o'clock, the said Sophie came to her, said Mary Fisher's, house, in Chicago, and seemed greatly depressed in spirits, and stated her troubles and sorrows, and spoke of putting an end to her existence, and said that she had bought a bottle of laudanum with which to destroy her life, and asked her, the said Mary, if she thought it was sufficient to kill her, and showed her the bottle; that something was said about the best mode of committing suicide, and a young woman who was present said the best way was by hanging, etc.

That a subpœna was issued and served on said Mary Fisher to attend said trial.

That during the trial, affiant's counsel learned that said Mary Fisher was about to leave the county of Cook, and thereupon moved for and obtained an attachment for her, and she was arrested and brought into court, but before an opportunity arrived to examine her in said cause, she by some means got out of the custody of the said officer and left the city, and could not be found when her testimony was wanted. And that she

left without the knowledge or consent of affiant or his counsel; but that her place of residence has since been ascertained to be Cincinnati. But such information was not obtained in time to procure her affidavit on this motion. Affiant further states that he never consented to any separation of the jury in said case.

John Van Arman, being sworn, etc., says: That he and E. W. McComas were the only counsel of said defendant on his trial. That neither of them, to affiant's knowledge or belief, consented to any separation of the jury, nor was any such separation directed or permitted by the court in his hearing. That no witness by the name of Mrs. Davis was sworn on the said trial; nor was any such witness in attendance, to the knowledge and belief of affiant.

That on one morning during the trial of said cause, affiant came into the court room before the court was opened, and found the jury in their seats, and that standing directly behind and in plain view, and but a few feet from them, was a door, with divers hooks and screws, driven or screwed into it, some or all of which were broken or bent down; that while the door was so placed, affiant saw some of the jury turn around and examine the said door, etc. This occurred both before and after the opening of the court. That after the opening of the court, affiant called the attention of the court to said door, etc., and inquired for what purpose it was there; whereupon the attorney for the People stated that experiments had been made on it with weights hung on the hooks, and it had been brought in and exhibited to prove the impossibility of the deceased having hanged herself, as stated by Jumpertz in his confession. That said affiant then moved to exclude said door, etc., from the room, which was done.

That the attorney for the People then proposed to bring into court the door of the room occupied by Jumpertz at the time of the alleged murder, and two hooks and a quantity of screws found in said room at the time of his arrest, and make and allow the jury to make experiments on them, by driving said hooks and screws into said door, and hanging weights on them for the purpose of enabling the jury to determine whether the deceased could have hanged herself in the manner stated by the defendant in his confession.

To this proposition the defendant by his counsel objected; which objection was overruled by the court, and said experiments directed to be made; and that said experiments were then made as proposed with said door, screws, hooks and weights, in the presence of the jury, and that the counsel for the people were permitted to, and did argue from said experi-

ments that it was impossible for the deceased to have hanged herself as alleged by the affiant in his confession.

E. W. McComas, being sworn, etc., says: That he has been the counsel for defendant ever since the finding of the indictment. That he conversed with one Theobold, at Milwaukee, who promised to attend said trial as a witness, if sent for. That said Theobold stated to him in substance that he would testify on said trial that, just before the deceased, Sophie Werner, left Milwaukee to come to Chicago, she spoke in a most desponding tone, and told him she would not be long in this world. That money was provided to send for the witnesses at Milwaukee, and George Kennedy was sent after them. That owing to the pressing engagements of counsel during the trial, said Kennedy was not furnished with a full list of the witnesses, and the name of the said Theobold was accidentally omitted, and that affiant was not aware of the omission until return of said Kennedy, on the evening that the evidence in said case was closed. That some time previous to said trial, one Mary Fisher, stated to affiant as follows: That she did not know the defendant; that she was acquainted with the deceased, Sophie Werner. That on Sunday morning, in the month of March, between 9 and 10 o'clock, the said Sophie came to her house in Chicago, and seemed to be greatly depressed in spirits, and stated her sorrows, and that she was desirous to put an end to her existence, and had bought a bottle of laudanum for that purpose, and asked her, the said Mary, if she thought it was sufficient, showing it to her. That something was then said about the best mode of committing suicide, when some young woman present told her not to take laudanum, as she would fail: that the easiest way was to hang herself, if she wanted to die. That said Sophie cried a good deal, and went away. That said Mary Fisher was subpœnaed to attend said trial as a witness, and that during the trial, affiant learned that said witness was about to leave the city, and procured an attachment and had her arrested by an officer, under said attachment; and that affiant seeing that she was in custody, rested satisfied; but before the time came to examine said witness, she had by some means got out of the custody of the said officer, and gone away, and could not be procured on said trial. That said witness left without the knowledge or consent of affiant, and as he believes, of the prisoner or his other counsel, and that he intended to examine her as a witness.

That he has since learned that she is in Cincinnati, but not in time to procure her affidavit on this motion.

That he was present during the whole of defendant's trial,

and that neither the prisoner or his counsel consented to the separation of the jury.

Wirt Dexter, being sworn, etc., says: He was present at the trial of said Jumpertz, and assisted in making some experiments with screws on a door. That he used some screws that he bought at a hardware store, and some said to have been taken from Jumpertz's room. That affiant was assisted in making said experiments by the said jury, and other experiments were made in which he did not participate. That affiant was not a witness in said cause, nor was he sworn therein; and while he was making said experiments, the said jury conversed with him, and he with them, about the said experiments; and while other experiments were being made, he heard directions given by various persons as to the manner of making them— none of whom does he now remember, except Haven, the State Attorney, and C. P. Bradley. That he was not one of the counsel for defendant, but voluntarily assisted in collecting the evidence of the defendant.

That he talked with Mary Fisher, and she told him the same in substance as testified by McComas. That he did not consent to, or know of her departure from the custody of the officer who had her in custody under attachment.

Abner Sutton, being sworn, etc., says: That he is a deputy sheriff of Cook county, and was one of the officers who had charge of the jury in said case. That at noon of the first day after the jury was empanneled and the testimony commenced, I was directed by John Everts, another deputy sheriff, to take one of the jury, by the name of Loomis, to his own house, to see a member of his family who was sick. I took said Loomis, separately from the rest of the jury, from the court house, to his own house, in Edina Place, from one-half to three-fourths of a mile. When arrived at his house he left me sitting in the parlor, and went up stairs, and was absent from me ten or fifteen minutes, or more. I do not know who was in the upper story of the house. I then accompanied said juryman back to the Sherman House, where he and I took dinner at the public table. On the next day the same thing was done again, and the juror remained up stairs the same time as before.

Ira Snow, being sworn, etc., says: That during the argument of said cause by counsel, one of the jurymen, by the name of Bliss, was separated from the rest of the jury, and left in the court room while the rest of the jury went to the hotel to dinner, for half an hour or more; that affiant, as deputy sheriff, remained with said Bliss; that when the doors were opened, he put the jurymen in an adjoining room, and that a woman, purporting to be the wife of the said Bliss, remained in the court

25

room and conversed with him during the time; that he did not hear them (Bliss and the woman) speak of the case except as to how long it would probably last; but they talked a good deal together in a whisper, which affiant did not hear and understand.

Simeon Y. Prince, being sworn, etc., says: He is deputy sheriff of Cook county, and had charge of the jury during the trial of said case. That on the evening of the second day of the trial, at the direction of Mr. Curtis, another deputy, he accompanied one of the jurymen named Loomis from the court house to his own house in Edina Place, from half to three-quarters of a mile; no one else went with us; when arrived at the house, he left me in the parlor, and went up stairs out of my sight, and remained absent about ten minutes, and then came back to me with a woman, who, I was told, was his wife; and after conversing with her ten or fifteen minutes, went back with me to the court house; on the next evening, the same thing occurred again, in the same manner. During the trial, the jury were lodged at the Sherman House (an hotel), in two different rooms, five in one and seven in the other, in different stories of the house. On one morning while the said trial was in progress, I accompanied the whole of the jury to the house of said Loomis, and left him there, and accompanied the balance of the jury about the distance of a block to the house of another juryman; I there waited in front of said house while said last named juryman went in, and was gone out of my sight in the house some five minutes; I then went back to the house of Loomis, who was out of my sight and presence about fifteen minutes; no officer accompanied either of said jurymen.

The following affidavits were filed, in opposition to defendant's motion for new trial:

1st. John C. Miller: Knew Mary Fisher for about two years; she lived on Clark street. About a week before trial, was at an interview between said Mary Fisher, himself, the district attorney, and J. Rehm. Being interrogated as to her knowledge of Sophie Werner, she stated that she was well acquainted with her, first while Sophie was living with her husband; witness was then living with one Hulme; she never knew Jumpertz at any time. Sophie stopped at her house, on Clark street, with book in her hand; stated she had come from church; said she had caught cold waiting for the bridge; could not tell whether it was one or two years ago; was uncertain. Sophie said she was satisfied that Jumpertz would not marry her, and that she did not know what to do; that she had a vial in her hand; said she had a good mind to take poison and kill herself; advised Sophie to get girls and open a house; said she was too

old. A girl who was present advised her to go to the pier and drown herself; she said she had tried that twice, but when she came to the water she was afraid. The girl then advised her to hang herself. They were all laughing, talking that if she poisoned herself they would pump it out of her. Minna Debus, of Milwaukee, was produced as witness. Affiant then and still believes her to be the same person called, by the defense, Mrs. Davis.

2nd. James Taylor, deputy sheriff: Served attachment on Mrs. Fisher, for defendant; brought her into court; placed her in jury room, in charge of Prince, a constable. Dexter went into room. This was Saturday, first week of trial. Prince *told* him how she left.

3rd. S. Y. Prince, deputized to take charge of the jury: Received Fisher when brought in on attachment; put her in jury room and locked it. Dexter applied to be admitted to said room to see witness; let him in; left the key in the door. Dexter soon came out, and he again locked the door and left key in door. Dexter visited witness several times; advised him to keep the door locked. About an hour after, went, and found witness gone; went to Dexter, and asked him why he left the door open, and told him Mrs. Fisher was gone. Dexter replied, " Is she? Well, I have been talking with her, and we don't want her, and if we do, we can send for her." I went then and told Taylor.

Thereupon, and after argument of counsel, the said court overruled the said motion, to which ruling and decision the defendant excepted.

The testimony relating to the conduct and declarations of the deceased and Jumpertz, at Milwaukee, as proved by the prosecution, was substantially as follows:

*Minna Kacher.* I live in Milwaukee; I knew Jumpertz, from June, when they came there, till they left; it is a year since they left. I also knew Sophie Werner; they, Sophie and Jumpertz, lived next door to me, in Johnson street. I saw them every day. I supposed she was his sister. They afterwards lived in Market street.

I might know Sophie Werner's hand-writing; can't tell. I have seen her write, several times. [Letter purporting to be written by Sophie Werner to Jumpertz, shown to witness.] I can't say for certain whether it is her writing. I think she wrote finer.

Sophie left Milwaukee, I think, the 3rd day of March, in the last train of cars. She had sent all of her bedding before. She took with her two traveling boxes, a mattress, clock, looking glass, and basket of things.

Sophie said she wanted to go; that Jumpertz had written to her to come; that she was to sell everything; if not, to put it up at auction, and sell it for eight or ten dollars, if it would not bring more. That he had written to her to come in the night train; that she should veil herself, and speak to no one on the train; that they (she and Jumpertz) would not stay in Chicago; that Jumpertz had written that he intended to go to St. Louis; that Jumpertz did not wish to stay in Chicago with her—he had written so; that she would go to him, but if he did not treat her better, she would not remain with him; that he had written to her not to bring on her clothes, he would buy her everything new.

On the cross-examination, witness says: She cannot be certain about the hand-writing of the letter shown her; can't say it is her letter, from appearance; she wrote finer and closer together.

Defendant's counsel moved to strike out all the testimony of this witness, relating to conversations between her and Sophie Werner, on the same ground on which it was objected to, and also on the ground that it purports to state the contents of letters, supposed to be written by defendant to Sophie Werner, and no foundation has been shown for such secondary evidence. Motion overruled, and exception taken.

Witness proceeds: [Letter again shown witness.] I think this letter has been twice before shown me, in Milwaukee; once in Mr. Beck's office, and once before in the summer. I don't remember seeing it any other time. Mr. McComas, one of defendant's counsel, showed me a letter at Milwaukee at my house; I did not read much of it; Mr. McComas asked me if that letter was Sophie Werner's hand-writing; I said I did not know, could not tell; I did not say it was her writing, nor give my opinion that it was; I never saw the letter that McComas showed me, before or since; the letter that McComas showed me is not the one shown me here in court; I never read the letters of Jumpertz to her, and only know about them what she told me; the inner part of this letter is like Sophie Werner's.

The contents of the letter that McComas showed me were like what Sophie had said to me; that was what I said to McComas, but I said I was not certain as to the writing; the sheriff was with McComas; the letter he, McComas, showed me, was not the letter shown me here in court.

*Eliza Raabe,* sworn, etc. Live at Milwaukee; knew Jumpertz and Sophie Werner there; I lived in the same house they did in Market street. Sophie said Jumpertz was her brother, at first; afterwards she said the child she gave birth to was his. Sophie left Milwaukee on the 3rd of March; Jumpertz had left

a little before Christmas. Immediately previous to Sophie's leaving Milwaukee, I did not talk much with her; the last time I saw her to talk with her, was a month before she left. I knew of her receiving letters from Jumpertz; she read to me the first one soon after he left.

Attorney for People proposes the following question: Do you know, from anything Sophie said to you, why she left Milwaukee?

Objected to by defendant, on the ground that the evidence called for is hearsay, and not admissible. Also, because statements called for not confined to the time of her leaving Milwaukee. Objection overruled, and exception taken.

Answer. Because she said that Jumpertz wrote she should come; this was all she told me. Jumpertz had written that she was to stay there until September or October; he had been to see her in August; she sold some of her things.

Question by People's attorney. Why, if you know, did she sell them?

Objected to by defendant's attorney, on the ground that the reason which she had or gave was immaterial and irrelevant. Objection overruled, and exception taken.

Answer. She said the defendant had written to her to sell them.

Defendant moves to strike out the last answer, because it is hearsay, and purports to give the contents of Jumpertz's letter. Overruled, and exception taken.

The court here ruled, and decided that he would permit the prosecution to prove any conversation of Sophie Werner, had with any person, between the time Jumpertz left Milwaukee, and the time Sophie Werner left, relating to her reason for leaving; to which ruling and decision, the defendant, by his counsel, then and there excepted.

Witness continues: Sophie Werner said to me, that Jumpertz had promised to marry her when she came to Chicago; that was what she always said to me; she told me about selling the furniture shortly before she left, when she got a letter from Jumpertz; it might have been three or four days before she left; she came up to my room, and said she had got a letter to sell everything and go to Chicago; that she was to go on the 1st of March, but could not sell her things, and get ready till the 3rd.

Counsel for defendant here moved to strike out all of above testimony of said witness, giving statements of Sophie Werner, for same reasons as before given. Overruled, and exception taken.

Witness continues: I don't know as I should know her hand-writing; I have seen her write directions on letters. [Letter of Sophie Werner, the same shown to last witness, exhibited to her.] The hand-writing I can't distinguish, but as to the contents, it might be hers; it don't coincide with what I have seen on the covers of letters of her writing; that was finer, and not so distinct.

Cross-examined. Sophie and Jumpertz lived friendly together; I should have known if they had not lived happily, as I could hear all that was going on in their room; they brought a good many things there from Chicago; Jumpertz bought others; he paid her rent half a year in advance before he left; she had supplies when he left, for a long time; she was generally pretty gay, sometimes in her serious moments, desponding; she said, how unhappy I am, and if witness only knew how unhappy she was, etc.; said she had some sorrow at her heart. The sheriff and Mr. McComas were at my house one or two weeks ago, and showed me a letter to read. I said after reading it, as I have said here, the contents might be hers, but as to the hand-writing I could not be sure; I said it (the letter) spoke in the same tone she often told me; I was asked if it was her writing; I asked to read it; did read it, and said, from the contents, it might be hers; I did not express any opinion only as to the contents; I did not say I thought it was her hand-writing.

Direct examination resumed. The letter that McComas and the sheriff showed me, is not the one shown me here in court at all; I don't know if this is the same hand-writing as the one McComas showed me; I think it is nicer; the one the sheriff and McComas showed me, looked more like Sophie Werner's hand-writing; I can't tell whether this is Sophie's hand-writing or not, with a certainty.

*Frederick W. Raabe.* I live in Milwaukee; I knew Jumpertz and Sophie when they lived in Milwaukee; they came to live in the same house with me, I think about the fall of 1857, on Market street; I carried letters for Sophie to the post-office, directed to Henry Jumpertz, Chicago, Illinois; one letter had ten dollars in it.

Question by People's Attorney. How was the address on the letter spelled—how was the word Henry spelled? The defendant objects to question, because the writing itself is the best evidence, and no foundation laid to introduce secondary evidence, and because spelling is not admissible as evidence of hand-writing. Objection overruled, and exception taken.

Answer. It was spelled *Henry.*

*Minna Veitenheimer.* I live in Milwaukee; knew Sophie Werner, and I think Jumpertz; they lived two houses from me

in Milwaukee. Jumpertz left about New Years or Christmas; Sophie left on 3rd of March.

Question by People's Attorney. Had you any conversation with Sophie when she left, about her reasons for leaving?

Answer. Yes, I was there when she left.

Question. State the whole of said conversation.

Objected to by defendant's counsel, on the ground that evidence is hearsay. Overruled, and exception taken.

Answer. She said Jumpertz had written to her to come; that they would live together; that they would open business in some small town.

Question by People's Attorney. State what Sophie said to you in such conversations about Jumpertz. Defendant objected, because the evidence is mere hearsay, and inadmissible. Counsel for People said, that defendant had set up that deceased died by suicide, and that he should show by acts and conversation of deceased, a state of mind indicating a tendency to suicide, and that this evidence was to rebut, by showing state of mind of the deceased. Counsel for defense admitted their intention to prove a tendency in the deceased to commit suicide, and did not object to order of evidence offered, but to its competency. Court overruled the objection, and defendant excepted.

Witness answers: She told me she had letters from Jumpertz, and was going away. She said she had received letters; that she was to follow him. Said that the last letter she received from him he wanted her to speak to no one, veil herself closely, and he would call for her; in a letter he had written to her before that, he had written to her to sell all her things, to send them to a store and sell them if they didn't bring but nine or ten dollars, and send the money to him, so that he could furnish them anew.

Defendant moves to strike out the above testimony of this witness, relating to conversations of Sophie Werner, purporting to give the contents of Jumpertz's letters, as inadmissible, for reasons before stated. Overruled, and exception taken.

Witness proceeds: She said she would write to Jumpertz; that she would like a few days to sell the things, so as to get more for them; she would carry some few things with her; he had written to her to sell everything, the dresses too, as he would buy new ones; can't tell how long before she left, it was that she said she received these letters, perhaps three or four weeks; she used to come to my house almost every day; when she went away she bid me good-bye; said she would write to me in four weeks; she was usually very gay; I had conversation with her once in my store, and she said she was going to travel to Chicago, and they (she and Jumpertz) were going to open business to-

gether; I can't say how long this was before she left, it might have been two months.

Counsel for defense moved to strike out all the testimony of this witness, relating to conversations of Sophie Werner, as mere hearsay. Motion overruled, and exception taken.

Cross-examined. I saw Jumpertz and Sophie together very little; what I did see, they were very loving together, on one occasion.

*August Herzberg.* I live in Milwaukee; knew Sophie Werner, not Jumpertz; after Jumpertz left, I had some conversation with Sophie relative to Jumpertz; three or four weeks before Sophie left, she came to my house; she said among other things, in the course of the conversation, that she had received a letter from Jumpertz, in which she was called to come to Chicago, on the 1st of March; she said she couldn't do that, as she couldn't sell her things; because she said she had been requested in that letter to sell all her things, even her dresses; she said she had received another letter after that, telling her to come; that she was to come veiled, and was to speak to no one, and remain at the depot till he (Jumpertz) called for her; I advised her not to do it; she said he was a smart man, and did not believe in any God, and such religious matters as she was telling of; she told me she had lived with her first husband and had become acquainted with Jumpertz; she said she had stated that she and Jumpertz were brother and sister, because Jumpertz had told her to say so; she said that she and Jumpertz were married by an American preacher secretly; the very last time she said she had written to Jumpertz, she had written that she wanted to come to Chicago; she said she had written so several times, and was only quieted some time longer; I saw her when she was packing up to go; she said she was going to Chicago; she said she had got money which had been paid for rent, returned to her; told me she had $60 to $80; said she would write soon; she has told me at different times, that she sent money to Jumpertz at Chicago, to help him pay for a lot he had bought some days before she left; I told her not to send money to Jumpertz; she said she would not; she was of good temper; was often longing for Jumpertz.

The testimony of this witness, relating to the conversations of Sophie Werner, was all objected to, and motion made to strike the same out, on same ground as other similar testimony, and overruled, and exception taken.

*Elizabeth Debus.* I am fifteen years old, and live in Milwaukee; knew Jumpertz and Sophie Werner in Milwaukee; Jumpertz left Milwaukee before Christmas; after he left, Sophie said she wanted to follow him soon; she received letters, one or more

a week; don't know who wrote them; I had heard he was her brother, but she told my mother it was not so; have seen her write four or five times. [Letter shown to other witnesses, is exhibited to witness.] I can't tell exactly if this is hers, but is the manner in which she wrote; I am not so certain about it; her writing was like this, not clear (plain), as far as I can recollect; she wrote as this is written; the form of the letters is like hers, perhaps a little longer, and not so separate as this; she might have written this; I got a letter from the post-office for Sophie; she said it contained good news; she could go to Chicago, and when she got to Chicago, Jumpertz would go with her to St. Louis; she said the day she left, she was going to Chicago; she said the day before, that she was to have gone by the 1st of March, but could not sell her things; she said he had written that she should be there by the 6th of March; from the time she got the letter, which she said contained good news, until she went, might be three weeks. The testimony of this witness, giving Sophie Werner's conversation, excepted to, etc.

*Edward Vollert.* I live in Milwaukee; know Jumpertz and Sophie Werner; sometime in August, 1857, they lived in same house with me in Market street; he left in December; she the 3rd of March following; she told me she had received a letter from her husband requiring her to come to Chicago, and asked me if I would not return the money that had been paid in advance for rent of house by Jumpertz; I paid her back $20 and wrote a receipt, and she signed it. [Receipt shown and identified.] She said she would start the next day in the train; she said she was going to Chicago to her husband; Jumpertz had rented the room, I think August 13, 1857; paid rent in advance to December, then paid again six months in advance. The statements of Sophia Werner, to this witness, objected to, and motion made to strike out, and overruled, and exception taken.

*Catharine Herzberg.* I live in Milwaukee; I knew Sophie Werner; did not know Jumpertz.

Question by People's Attorney. Did you have any conversation with Sophie, after Jumpertz left Milwaukee? Objected to by defendant on same grounds as before. Objection overruled, and exception taken.

Answer. Yes, she talked with me about him several times.

Question. What did she say? Objection overruled, and exception taken.

Answer. I can't state the time; she said Jumpertz was in Chicago, and would write to her when she was to come to him; she was not to come yet; she was to stay in Milwaukee till July before she would come; and that she was to remain with him, and she told me of the letters he had written her, and

what was in them. Objection was made by defendant to her stating anything that Sophie said was in the letters, because hearsay, and no foundation or reason shown for introducing secondary evidence of their contents. Objection overruled, and exception taken by defendant.

Answer. She was to come to Chicago, veiled, and speak to no one at the depot; that he, Jumpertz, would send a man for her, who would lead her to the house; that his room was four stories high.

That she was to sell everything; to bring the ironing board and the hatchet; to sell everything but these; was to sell because they wanted to go to St. Louis; she said he had at different times written her to send him money. The child's things she must sell; she said she would not; she could sell them in Chicago, if necessary; she said he had requested her not to show the letters, but to burn them immediately.

She then told what she had written to Jumpertz. Defendant objects to witness giving relation of said Sophie Werner, of contents of her letters to Jumpertz, for same reason as above given. Overruled, and exception taken.

Answer. She said she had written to him, that *she would come to see him once more, veiled;* would come for his sake. She cried then a good deal; she said she was to come veiled; she said that she had written to him that for his sake she would come to see him once more; she said if he did not treat her well she would go away, and take a room and wash. It was on Monday she told me she had written to Jumpertz; she had the letter lying there; I did not read it; this was on the 1st of March; I never saw her write except that Monday; it was on first of March; I should not know her signature, but the letter I saw I think I should know. [Same letter shown to other witnesses exhibited to this witness.] I can't say with certainty, but I think the letter I saw was a little more bluish; the letter I saw had a blank at the head, of about four lines; I can't say with certainty that this is the letter; I did not go very close to her; I can't tell certain whether this is the same letter I saw; it was to Henry Jumpertz, I think.

Question by People's Attorney. Did Sophie state to you whether she and Jumpertz were married?

Objection by defendant's counsel, and overruled, and exception taken.

Answer. She said they were married by an English priest. When she started she said she was going to Chicago, etc.; she was glad to go; she sold me things; we were together almost every day while she was at Milwaukee.

Cross-examined. I saw her cry several times during these times; can't say how often; she said she was so unhappy; she had

to thank Jumpertz for her misfortune; said she had married him in New York, and had moved with him to Chicago.

*Anna Debus.* I live in Milwaukee; knew Jumpertz and Sophie Werner; they lived close by us, up stairs, three months from June, 1857. Jumpertz left in December; after he left, I had conversation with Sophie about him.

Question by People's Attorney. State what it was. Objection, and overruled, and exception by defendant.

Answer. She said they were not brother and sister, but lived together; were not married; that they wanted to get together; she always wanted to go to Jumpertz; she said she was going to Chicago, because Jumpertz had sent for her; they would go to St. Louis; she would sell everything, and go with only a carpet bag, if she could get only eight or nine dollars; she sold me the old things, but took some away, two trunks; I saw her the day she left Milwaukee.

In reference to the experiments before the jury, the bill of exceptions states substantially as follows:

Before the opening of the court on this morning, a door, having a number of hooks and screws driven and screwed into it, was brought into the court room, and placed immediately in rear of the jury, and in plain sight of said jury, many or all of said hooks being bent or broken down, which door, with said hooks and screws, remained in the presence and plain sight of the jury until the opening of the court. The defendant's counsel called the attention of the court to said door and hooks and screws, and inquired for what purpose it was exhibited. To which the attorney for the People replied that the said hooks and screws had been screwed into the said door, and experiments tried on them, by placing or hanging weights on said hooks and screws, to show the impossibility of the deceased, Sophie Werner, having committed suicide by hanging herself on a hook or screw, screwed or driven into a door in the manner stated by the defendant in his confession.

The counsel for the defendant then objected, and took an exception to the exhibition of the said door to the said jury, and moved the court that the said door, hooks and screws be removed from the presence and sight of the jury, which motion was granted by the court, and the said door was removed.

There was no evidence tending to prove that the door so exhibited to the jury, was the door of the room in which the said deceased was stated by the defendant to have hanged herself; but, on the contrary, the door of the said room was afterwards produced in court, and it appeared to be, and was a different door; nor was there any proof that the said hooks and screws were the same found in the room of the defendant; nor

were they in any manner identified. When the court ordered the last mentioned door to be removed, it decided that no experiments would be allowed to go to the jury, except those to be made on the door of the prisoner's room, and that those should be made in the presence of the jury.

The attorney for the People then brought into court the door of the room occupied by the defendant at the time of the alleged murder, and two hooks and a quantity of screws found in said room at the time of the arrest of the defendant. Some new hooks and screws, together with a new hemp cord, had also been brought into the room by a Mr. Dexter, as a friend of the prisoner, and in his behalf.

The prosecution then proposed to make experiments on the door of the prisoner's room, in the presence of the jury, with a view to test the possibility of the deceased having hung herself in the manner alleged by the prisoner on his arrest. To such or any experiments being made in the presence of the jury, the defendant, by his counsel, then and there objected, and assigned among others the following reasons:

1st. The prosecution does not propose to produce the same screws or hooks, or the same rope, (or one even of a like kind,) upon which the deceased hung herself, as alleged.

2nd. Nothing but the testimony of experts is competent upon a question of skill or science.

3rd. Upon questions of common experience, no evidence whatever is admissible.

4th. It is not proposed to give in evidence any fact or circumstance alleged to have occurred, nor any admission of the defendant.

5th. Because the proposed experiments are immaterial, irrelevant, necessarily uncertain, and otherwise incompetent.

But the court overruled the objection of the defendant, and directed the experiments to proceed in the presence of the jury; to which opinion and ruling the defendant excepted.

And thereupon the prisoner's counsel stated to the court that certain screws with hooks on them, to wit, one large and one small one, were presented, and were alleged to have been found in the prisoner's room at the time of arrest; that he understood the prosecution would make the experiments upon the supposition that the rope was attached to the curve of the hook; that the screws of the hook were in fact long enough to reach through the door and still leave room enough on the shaft of the screw, between the shoulder and the door, to amply hold a rope; and that the defense would contend that the rope was placed by deceased between the shoulder and the door, and not on the curve of the hook; and that if the prosecution were

first allowed to make the experiment on the curve of the hooks, and break or bend them, that no experiments could be made on the prisoner's view of the case ; and that while the prisoner objected to the experiments *in toto*, yet he requested, for the reason aforesaid, that the first experiments should be made by the prisoner, as it was conceded on all sides that if the prisoner failed on his hypothesis of the mode of placing the rope, he certainly must in that of the prosecution.

The court conceding the reasonableness of the prisoner's request, decided that the prisoner should have the full benefit of his exceptions to the experiments, and still, for the cause assigned by his counsel, would allow the first experiments to be under the control and direction of the prisoner. The experiments were then proceeded with. All the experiments were made on the door by placing the same against the judge's stand, and the jury holding the same against the wall and suspending one of the jurymen, who stated that he weighed about one hundred and forty-three pounds, by the said new hemp cord.

The first experiments were made by Dexter, who made them at the instance and request of defendant's counsel. The experiments made by him, and under direction of prisoner's counsel, were made partly on the two hooks, and on two of the screws brought into court by the prosecution, and found in his room at his arrest. The experiments made subsequently by the prosecution were made with the same rope, attached to leather straps at the shoulders of the juryman who was suspended, and on the two hooks from the prisoner's room, and on two screws, one found in said room and the other brought in by said Dexter, as aforesaid.

The result of said experiments was as follows :

The door was placed against the shutters in the rear of the judge's bench, and the experiments commenced.

1. A hole was bored in the head and tyle of the door, and a two-inch screw screwed in, A. Wheaton, a juryman, hung to it, and held.

2. An inch-and-a-half screw was then used, with the same effect.

3. The juryman stepped off the chair, and the screw gave.

4. The juryman stepped off the chair, the rope slipped, and the screw was pulled nearly out.

5. A hook, size of smaller one found in the room, used, and did not give.

6. Another screw, of same size, used with same effect.

7. Experiment on last hook ; did not give.

8. Experiment on plain one-and-a-half inch screw ; did not give.

9. Same experiment, with same effect.

10. Tried by prosecution, on a hook similar to the one used in No. 5 hook; the hook broke.

11. By defense, one of hooks found in Jumpertz's room; it did not give.

12. By prosecution, on same hook in a different place; hook was bent down.

13. With the same hook; juror stepped from chair, and hook pulled out.

14. A two-inch screw used, and when juror stepped from the chair, it was nearly pulled out.

15. A screw found in the room was then used, and when the juror stepped off from the chair, it remained firm.

The evidence of state of mind of deceased; her tendency to suicide, and also as to her hand-writing, on the part of the prisoner:

*Louisa Weglehner.* Knew Sophie Werner seven years very well; was intimate with her; lived in the same house with her; I know her hand-writing; often saw her write in market book and letters. Letter purporting to be written by Sophie to Jumpertz shown her—same letter shown to Milwaukee witnesses. It is her hand, I am sure it is her hand-writing, it is the very same; I know Jumpertz since he came to this country; when he first came to New York he lived with us; he also boarded with us here in Chicago; his character was good, first rate; he got acquainted with Sophie Werner at our house; she had parted from her husband before; after he became acquainted with her, she came to our house to work; while she lived with Werner, her husband, she had a great deal of trouble; he kept another woman; the woman he kept was boss of the house, and Werner gave her all the money and control, and compelled his wife to do all the work, and to go to her for money, and told her if she didn't like it, to leave; Mrs. Werner had to do the washing for this girl; sometimes she was compelled to sleep in the same bed with Werner and the woman; she sometimes said she would go away; would go and try to get another place; one day they had much trouble, and the girl told her to go, if she did not like to stay; she said she would go, and bid me good-bye, and started; in three hours she came back; in the conversation that followed, she said a shilling's worth of laudanum will do for me; I said she was crazy; she had better go and get a place in a small family; she declined, and asked me how I would like to do so; I told her I feared she had laudanum in her pocket; she said no, and went away; I did not see her till next morning; that night some one came to our room and walked up to my husband and said, Sophie had poisoned

herself; Mr. Werner's brother, George Werner, brought the word; said she had taken something, and he believed it was poison; I saw her next morning at 9 o'clock; she came to my room and cried; she said a shilling's worth of laudanum was not enough; God did not like her; she began to vomit; one cheek was red, and the other was white; she asked me to fix her a bed, she couldn't stand; she was sick all that day, and I nursed her; she said she took laudanum; she said she felt drunk, and her husband gave her warm water; soon after this, she and her husband went out of our neighborhood, and I did not see him again until after she had separated from her husband, and was washing for her living; she came to see me, and said she had to wash for her living, and was not able to do it, and wanted to live with me, and I consented, and she came; while she lived with us, she would cry sometimes and then laugh; she was all the time in these crying and laughing fits; she would begin to cry, and then laugh and jump, and say I must not think of it; I must put it out of my mind; she cried frequently, and seemed in trouble too much; she left my house before Jumpertz did; she had been married five years; had had five children, all dead; her husband sent her to the old country from New York; while she was gone, came out to Chicago and lived with another woman; on her return she came on to him.

*Frederick Weglehner.* Is husband of last witness; knew Sophie Werner and know Jumpertz; has known Sophie ten or eleven years; the letter is her hand-writing; knows her handwriting; has seen her write; relates her treatment by her husband, and the state of her mind, and attempt at suicide, the same as last witness; also, testifies to her going twice to the river to drown herself; her husband was at last indicted for adultery, and ran away; knew Jumpertz same time as last witness; his character is good; was always steady, industrious and peaceable.

*William H. Eddy.* Knew Sophie Werner; she worked in her husband's shop, 84 Randolph street; I had a conversation with her; it was about the time Werner was indicted for adultery; I procured indictment; she told me her troubles; said she was treated worse than a nigger; she was willing to work for decent people, but not for that whore down in her husband's shop, and sleep in the same bed with her and her husband; I can't stand it; she said she had to do all the menial work, and be treated worse than a slave; I don't think I ever saw her smile; I remarked this; she said she had no desire to live in such trouble, and there was no prospect of its being ended; I got Werner indicted, and he ran away; she did not do anything against him; she left me crying the last time I saw her, near

the court house, in the street; I thought her despair increased after her husband went away; she said she was left sick and desolate.

*Isaac Shelly.* Knew Sophie Werner while she lived with her husband; he had another woman; she seemed much dejected, and threatened to kill herself.

*Augustus W. Goetz.* I live in Milwaukee; have known Jumpertz two years; he worked for me in Milwaukee eight or nine months; his character was good; he was peaceable, industrious and steady; he lived with Sophie Werner there; he told me about their relations when I employed him, and asked me if it would make any difference with me; she once asked me to pursuade him to marry her; I spoke to him about it; he refused, said she was too old, etc.; spoke well of her; I told her he refused; she said, I cannot be mad at Henry if he does not marry me; she liked him very much.

*Cross-examined.* I saw Jumpertz after he was arrested, and asked him why he cut up the body; he said he could not get it into the barrel without; he said he did not know where the entrails were, as he buried them at night; I never heard anything against him before his arrest; everybody liked him.

*Hiller Buchenhimer.* Live in Milwaukee; knew Jumpertz since a year ago, when he came to Milwaukee; he worked for me from May to December; for me and Goetz; his character was good; when sheriff Gray and McComas came to Milwaukee, I went with them, as interpreter, to see Minna Kacher; a letter was shown her, the same one shown her here; I asked her if she could tell by the hand-writing if this is the hand-writing of Sophie Werner; she read it and said she thought it was Sophie's hand-writing; could not tell exactly; she said it looked like her hand-writing; had the appearance of it.

*John Gray.* I am sheriff of Cook county. [The letter purporting to be written by Sophie Werner to Jumpertz, and claimed by prosecution as a forgery, shown to witness.] I took this letter to Milwaukee.; McComas went with me; we showed the letter to this old woman, (Minna Kacher); this is the same letter; it was given back to me.

*John Lotz.* I worked for Frazza & Ribolla in March, 1858; Jumpertz worked there one day; Jumpertz got leave to go to post-office; he went and came back with a letter in his hand; he opened and read it, and handed it to Seigletz, who said, "She wants to come and see and kiss you and afterwards die;" Jumpertz took off envelope as he came in, and threw it in the stove; I saw the stamp on the back, Milwaukee; Seigletz told him he'd better save the letter; he said, I never save any letter from her, but it might be best to save it; I went up stairs and

got him an envelope, and he put the letter into it, and put it in his pocket; this was about the first day of March; I said, what a foolish thing to write; Werner asked defendant what was the news, and while defendant and Seigletz were reading letter, a customer came in, and George had to shave him, and defendant told him he could read the letter in their room.

*August Seigletz.* On 1st of March, 1858, I worked for Frazza & Ribolla, barbers, in Chicago, and defendant worked there; defendant asked Frazza for leave to go to post-office after letter; went and got it; one remark in the letter was that she would come and see and kiss him once more and then kill herself; Jumpertz asked for an envelope and it was gotten; Jumpertz said he would keep the letter, for it would help him sometime if he got in trouble with her.

*Cross-examined.* The letter was received Monday or Tuesday, the first week in March, it might have been first or second; Jumpertz tore off envelope and put it in the stove, as he always did; all but business letters; he said the letter was from Mrs. Werner; I can't remember whether I had the letter in my ands; at this time I understood Sophie was coming to Chicago; Jumpertz said she was coming to see him and then going away; all I understood was, she would be here on some evening train; he read out of the letter that she would then go away and trouble him no more.

*Frederick Becker.* I publish the National Democrat; I published letters for German parties in my paper of March 1st, 1858; I published a letter for Henry Jumpertz; it was published on Tuesday, 2nd of March; it was spelled Hein. Jumpertz; we got the list of letters from post-office on Monday, the day before; it would have been published on that day if it came to the office any time in fourteen days before; the letter may have been in the office twelve or any number of days up to fourteen.

Substance of evidence as to confessions of prisoner:

*Jacob Rehm.* On the same evening of his arrest in my office, Bradley had conversation with the defendant in my presence, and in the presence of John C. Miller, the City Attorney; he said his name was Henry Jumpertz; came from Prussia; twenty-four years old; he stated that he was acquainted with Sophie Werner; got acquainted with her at Weglehner's; asked Mr. Bradley if he was the Judge. We told him who we were; one asked him where Sophie Werner was; he said, "I guess you know;" he said he knew Sophie Werner; she lived at Weglehner's, and came to bed with him there one night; that on Sunday he went home to his room, and found her hanging in his room; as he opened the door he found something hanging

against it, about a foot from the floor; the dinner was on the table as he went in; he sat down by the window; don't know whether he took her down first; sat by the window half to three-quarters of an hour; took her down and laid her on the bed; and there was a line or letter on the table, saying good bye; read the slip or line; laid it on the window, the wind blew it out; she hung on a cotton rope or cord, on a plain screw, with a hook same as they have in barber shops; did not know what to do, whether to see the coroner, or what to do; concluded to cut her up, for fear friends would hear of it; he took out the intestines and buried them away out on the prairie, one or two miles; cut off the hair; don't remember as he mentioned what he did with the rope; he cut her up and put her in a barrel, and kept it some eight or ten days; on the 17th, he got a drayman to take it to depot; he said he cut her, and a little blood came, not much; I had a talk with him next morning; I told him if he could find the place where he buried the intestines, I would go with him; said he thought he could not find it. [A box of old irons, chisel, saw, case of surgical instruments, knife and letters shown to witness.] These were found in Jumpertz's room when he was arrested; it was some days after first conversation that I offered to go with defendant to find the remains; he said he would not know the place; I found two screw holes in the door of Jumpertz's room.

Cross-examined. When defendant made his confession, he seemed disposed to make a full statement; he was excited some, and spoke quick; on the first night he said he buried the intestines on the prairie, and pointed north; the next morning he said on the lake shore in the sand; I am acquainted with land north of city; the sand reaches back from lake in some places half a mile; said he buried them (the intestines) in the night, and didn't know as he could find them; I have been pretty active in this cause; went to New York, hunted up evidence, etc.

*C. P. Bradley.* I am a detective policeman, and have been four years; have acted with Marshal Rehm in relation to Jumpertz's case; went to No. 30, Pomeroy's block, to examine room, etc.; I, with Marshal Rehm, arrested defendant, and went with him to Marshal's office, and there heard his confession; said he was a Prussian, twenty-four years old, had worked as a barber in New York, Chicago and Milwaukee; he asked me if I was the judge; said he wanted to tell the judge all; I asked him if he had a female friend; said he had; asked him where she had gone, he said I guess you know; told how, and when and where he got acquainted with Sophie Werner; where he boarded with her, and about her having a child, etc.; that the Dutch taunted

him about his connection with her, and he went to Milwaukee; stated how long they lived there, and then he left her and came back; she wanted him to marry her, he refused; finally he wrote for her to come, and she came the fore part of March; he took her to his room; no one saw her there; on Sunday he worked in the shop till 12 o'clock M.; that when he opened the door of his room, it opened hard; he found her hanging by a cotton cord on a plain screw, which she screwed into the door herself; I was very much frightened for half an hour; first thought to go for coroner, then thought as I was a stranger, and nobody knew me, feared the disgrace, and that it would get into the papers; then thought I could dispose of the body by cutting it up into small pieces; while thinking the matter over, I saw a note on the table, that she was tired of life, forgave me, etc.; he said the paper blew out of the window; he said he took a lancet after he had taken her down, and put her on the bed to bleed her, to see if she was dead; got only a little drop of blood from the arm; I asked him why he did not call some one in; he said as he had begun to cut her up, he must go through; he said he destroyed the cord; he buried the entrails and cut her up, etc., same as stated by Rehm; went to Jumpertz's room again; found things, and among them the letter purporting to be written by Sophie Werner to Jumpertz (the same shown to Milwaukee witnesses, an interpretation of which is hereto attached); this letter was in a blank envelope with other papers on a table.

Cross-examined. Jumpertz said when he came into the room and found her hanging, he took her at once and laid her on the bed; felt bad, and hesitated what to do; went to the window and saw the paper; went to window for air; read the paper; window open; while he was hesitating, the wind blew the paper out of the window; I give the substance of what he said; I don't know whether he said he felt of her to see if there was any life before or after he took her off the bed; he tried to bleed her, to see if she was dead; this confession was before the body was returned from New York; can't say whether he said he cut one or two holes in her arm; he said he buried the entrails out on the prairie, on north side; thought he could find them if some one would go with him; he said he had destroyed all the letters she had written him, but one, that in which she said she wanted to kill Werner; told where he had sent her clothing; he had sent them to a respectable person in Massachusetts; Jumpertz did not say she hung on such a hook as is in barbers' shops; I may have said I would hang Jumpertz on that hook; I have not a deep feeling to convict him; if I said I would hang him, it was in joke.

*John C. Miller.* I was present at Jumpertz's confession; gave account of his name, age, history, where he worked and for whom, where, how and when he became acquainted with Sophie Werner; same as last witnesses substantially.

*William Tenbroeck.* Am jailor; while Jumpertz was in jail he sent for Doctor J. A. Hahn to come and see him, and I was present at this interview; Jumpertz said to the doctor, I have sent for you to see if they can tell whether she (Sophie Werner) had been poisoned so long ago; I think the Doctor said he thought not; don't remember what he said; I said they could tell if they had the stomach; Jumpertz said he had taken it out; I said they could tell if she was hung, by the mark on the neck; he said he guessed that was cut off with the head; I don't remember anything else that was said.

*Dr. James A. Hahn.* I knew Jumpertz as a barber before his arrest; he used to shave me; I only had one conversation with him since his arrest; it was in the jail, in presence of jailor Tenbroeck; he said he wished me to do him a favor; I told him I would do so if I could; he said they were trying to make out that Sophie Werner was poisoned, and he wanted me to be present at the examination of the body, so that he could have some one he had confidence in to do him justice, and tell the truth about it; I said I had heard the inwards were removed and we could tell nothing about it; he said he had taken out all below the partition; I then said we could tell nothing about it: this was all that was said.

Counsel for the People then offered in evidence a letter from defendant to Mrs. Eberts, and proved the letter to be in the hand-writing of Jumpertz. Defendant objected, because the letter was irrelevant and immaterial. Court overruled objection, and defendant excepted.

Prosecution then offered, and gave in evidence to the jury, a letter, purporting to be written by Sophie Werner to defendant, threatening suicide (being the same letter shown to Milwaukee witnesses, and declared by the prosecution to be a forgery.)

Prosecution then offered in evidence a receipt, signed Sophie Jumpertz, dated March 3rd, 1858, given by her to Edward Vollert, offered it as the hand-writing of Sophie Werner, the only specimen prosecution could obtain. Defendant objected, as it was offered only for purpose of comparison of hands, which was not admissible. Objection overruled, and exception taken. The receipt was admitted in evidence and placed in the hands of jury.

Prosecution then offered a piece of the genuine hand-writing of Henry Jumpertz. It is offered simply as a writing, and not on account of contents. Defendant objects, on the ground that

Jumpertz *v.* People.

it can only be admitted for comparison, and for such purpose not admissible. Objection overruled, and exception taken.

### LETTER OF SOPHIE WERNER.

*Dear Henry:* Thy letter I have received and has grieved me much my forebodings came true how unhappy I am, yes, Henry unhappy I am long as I know thee love, I will bear for I have deserved it disgraced my parents under the ground. O Henry all for thee whom I loved yes I come veiled to see thee once more then I will flee forever to renounce thee and pray for thee and weep.

O Henry thou hast taken from me of my all, my honor. I will renounce thee, no longer annoy thee, be happy. I shall find my *home* with my mother, ay that was a virtuous wife no adulteress like her child. Yes my love could do all because, thus I had never loved. Now I must atone, had I ever loved Werner so much, but it is over, avenge myself I will on him ere I die, on thee I will not avenge myself, for I indeed loved thee, but I knew it all before, thy wishes I will fulfill, one kiss yet from your lips then I will flee ever ever.

And forgive me for it if I have grieved thee. It was not my will. O, how happy was I when thou was sitting by my side. I forgot everything, sorrow and misery. Oh, good Henry, don't be angry with me, and I am not angry with thee, for I love thee. Yes, a woman who renounces the world because of a man—I forget thee, never, not even in the grave. You want to imprison me ; thou art right, I do deserve it. Why did I not follow my mother's symbol, chastity ? But to thee I ever gave all—my whole heart. Farewell, don't forget thy Sophie, all that I could not say when taking leave, my heart would be too heavy. I will go to Chicago, so long until I leave for Rochester. Werner must die with me, for he has caused my ruin and my mother's death. Be happy, I forgive thee everything ; farewell and be happy. Thine ever true loving SOPHIE.

Thy name I don't deserve then farewell and be happy. I know not Henry who interrupted me in writing. Guess who it was. Charlie knocked at the door. I ask who is there he says I want to tell you something from Henry. I unlock the door, he came in, was drunk somewhat, and chased me about the room until 12 o'clock like a lion. Ah, ah, good friend, even that had to feel upon my heavy heart, till I fled. I deserved it. Why did I not become a wife when I loved you secretly ? It was no such sin. I have also written to my sister. That dog of a man goes away to-morrow. He promised strictly to me not to tell my shame to my sister. O Henry it is hard to write husband and I not be the wife. Forgive me, I cannot do otherwise, veiled. No woman is permitted in the house. Until Wednesday, thou art and remainest my Henry. Have no care, I will fulfill faithfully all thou hast commanded. Till I have seen thee, farewell ! SOPHIE.

Jumpertz was found guilty, and sentenced to be executed ; and prayed this writ of error, and assigned the following errors :

*First.* It does not appear that the indictment was ever found or acted upon by the grand jury.

*Second.* The court erred in overruling the motion to quash the indictment and each count thereof.

*Third.* The continuance of the cause at the September term of the Common Pleas Court, 1858, was erroneous, as it does

not affirmatively appear that causes justifying a second continuance were presented to the court, by the People.

*Fourth.* The Circuit Court erred in not discharging the defendant at its November term, 1858.

*Fifth.* The Circuit Court erred in continuing the cause at the November term, 1858, in the absence of, and without the consent of the prisoner or his counsel.

*Sixth.* The Circuit Court erred in overruling each of the defendant's several motions for a discharge, at the January term, 1859.

*Seventh.* The court erred in putting the defendant upon his trial when they had no legal right to hold him in further custody on the charge for which he was indicted.

*Eighth.* The court erred in overruling the defendant's motion for a continuance, at the January term, 1859.

*Ninth.* The court erred in permitting the proof, by the prosecution, of the conversations and declarations of Sophie Werner at and shortly before her leaving Milwaukee.

*Tenth.* The court erred in permitting the prosecution to prove the conversations of Sophie Werner, detailing the contents of letters purporting to come from defendant.

*Eleventh.* The court erred in permitting other conversations of deceased to be given in evidence by the prosecution, prior to and not at or shortly before her leaving Milwaukee.

*Twelfth.* The court erred in overruling the defendant's several motions and each of them, to exclude from the jury the several conversations of deceased.

*Thirteenth.* The court erred in permitting oral evidence, to prove the letters of prisoner and deceased, without a proper foundation being laid.

*Fourteenth.* The court erred in allowing witness Raabe to testify as to the manner of the spelling the name " Henry," on the back of a letter put in the post-office by him, at the request of deceased, and directed to prisoner, the said letter not being present, or its non-production accounted for ; and in overruling the defendant's objection to the questions calling for such testimony.

*Fifteenth.* The court erred in allowing the evidence of the Milwaukee witnesses, touching and detailing the conversations of deceased, to show her state of mind, before evidence had been given by defendant touching her state of mind.

*Sixteenth.* The court erred in each of its decisions overruling each and every of the objections made by the defendant during the trial, to the admission of evidence, as set out and preserved in the record of the cause, by bill of exceptions, etc.

*Seventeenth.* There was error in the introduction and exhibition to the jury, of the door other than of prisoner's room, upon which the prosecution had made experiments with hooks, etc., and as stated in the bill of exceptions.

*Eighteenth.* The court erred in permitting and directing the experiments on the door of the room of the prisoner to be made in the presence of the jury, as and in the manner and with the materials mentioned and set out in the record by the bill of exceptions.

*Nineteenth.* The court erred in permitting the letter, purporting to come from defendant to Mrs. Eberts, of Massachusetts, to be read in evidence by prosecution.

*Twentieth.* The court erred in permitting writing, purporting to be that of defendant, to go to the jury for the sole purpose of showing his writing to the jury, and not on account of its contents.

*Twenty-first.* The court erred in permitting the receipt, signed by Sophie Werner, to go to the jury.

*Twenty-second.* The court erred in permitting the receipt of Charles Quentin & Co., to go in evidence to the jury.

*Twenty-third.* The court erred in permitting Alexander Siller to give oral evidence, and, in fact, any evidence at all, of the character of the account opened with Hoffman & Gelpcke— the time it was opened—and also in allowing him to give oral evidence of the contents of the draft sold by witness to defendant.

*Twenty-fourth.* The court erred in giving all, and in giving each, of the instructions asked by the attorney for the People.

*Twenty-fifth.* The court erred in refusing to grant to the defendant a new trial, and in overruling his motion therefor.

J. Van Arman, and E. W. Mc. Comas, for Plaintiff in Error.

C. Haven, for the People.

Caton, C. J. The great length of the record and of the written arguments in this cause, together with the necessity of filing the opinion of the court at the announcement of the decision, which has to be prepared during the term, while other business is pressing upon us, prevent us from even noticing all the points which have been raised and discussed, and, most of those which are noticed, must be treated very succinctly.

The receipt signed by the deceased, and the letter written by the prisoner, for the purpose of proving, by a comparison of the hand-writing of the two, with the letter produced by the prisoner, on the trial, as having been written by the deceased, was not written by her, but was written by the prisoner, was in viola-

tion of a well-settled rule of law, and should not have been admitted. The rule that the genuineness of hand-writing cannot be proved or disproved, by allowing the jury to compare it with the hand-writing of the party, proved or admitted to be genuine, obtains in criminal as well as in civil cases. The genuineness of a promissory note could not be so proved, though the matter in controversy did not amount to five dollars. Certainly, then, where the life of a human being may depend on the result, the rule of law cannot be less strict. We shall not stop now, to discuss the propriety or reason of this rule. It is sufficient that it is well settled, and universally observed.

Nor can we approve of the exhibition to the jury, during the recess of the court, of the door, screws, hooks, etc., or the experiments made with them, in the presence of the jury, during the trial. We will not say, that in no case can experiments be made in the presence of the jury, for the purpose of illustrating some point in controversy. Such a proceeding, to say the least, is very uncommon, and should be permitted by the court with great caution. We will not say that, were this the only ground for reversing this judgment, that we would yield to it.

In opening their defense to the jury, the counsel for the prisoner had stated, that the theory of the defense was, that the deceased had committed suicide, and that they should, upon the trial, introduce proof tending to show a frame of mind in her, predisposed to that act. In view of this, the court permitted the prosecution to show her acts and declarations, on all subjects, for several months previous to her decease, for the purpose of proving that she was in a cheerful and healthful mental condition, and not predisposed to suicide. It would have been better and more regular, no doubt, for this testimony to have been reserved, till after the testimony of the prisoner on this point had been adduced. Although his counsel had stated in their opening, that they should introduce the testimony stated, and insist that the deceased died by her own hands, yet they had an undoubted right to change their minds on that subject, and adopt another line of defense, after the evidence for the prosecution had closed. It was only proper as rebutting evidence, and its proper and legitimate order, was after the testimony for the defense was closed. The minds of the jury should not be forestalled or prejudiced upon any subject, by rebutting evidence, when there was as yet no testimony upon the subject to rebut. It was the right of the defense first to occupy that field of inquiry.

That the acts and declarations of a person alleged to be insane, or predisposed to suicide, are competent to prove a contrary state of mind, is not and cannot be doubted, but then

they should be only such acts and declarations as fairly tend to prove the mental condition of the person alleged to be mentally diseased; and care should be taken by the court, that under a pretense of proving this mental condition, other acts and declarations, not fairly bearing on this point, be not admitted, for other and illegitimate purposes; and it is one of the most sacred duties of the court, to adopt every possible precaution, that the evidence thus admitted be not perverted to other purposes, by admonishing the jury, that such declarations do not in the least tend to establish the truth of any fact thus proved to have been stated by the deceased, and also by sternly rebuking any attempt, or the least approach towards it, by the counsel for the prosecution, intimating to the jury that such statements tend in the least degree to establish the truth of the facts related. Indeed, any such course would not only be an unlawful and wicked attempt upon the life of the prisoner, but would betray a consciousness of weakness in the case made against him. While, from the necessities of the case, such testimony must be admitted, the temptation is very great for counsel, in their zeal and in the excitement of the trial, to extend its influence beyond its legitimate object; and it is very difficult, if not absolutely impossible, for the jury to divest their minds of the impressions which it is calculated to make, as tending to establish the truth of the facts stated in such declarations, in spite of every effort of the court and counsel on both sides, to confine its influence within its legitimate purposes. While some of the statements of the deceased, which were sworn to by the witnesses, are no doubt justly subject to criticism, as not fairly tending to elucidate her mental condition in the regard referred to, yet it was perhaps no more so than would inevitably creep into the case, in spite of the strictest precautions on the part of the court, and without any intentional unfairness on the part of the counsel for the prosecution. While, from the character of the statements of the deceased, which were proved, we cannot divest ourselves of the apprehension that the jury were unable to divest themselves of all improper impressions, which such statements were calculated to produce on their minds, we do not think we should be called upon to grant a new trial for this cause.

The irregularities alleged in the conduct of the jury, alone remain to be considered. They are shown by the following affidavits:

" Abner Sutton, being sworn, etc., says: That he is a deputy sheriff of Cook county, and was one of the officers who had charge of the jury in said case. That at noon of the first day after the jury was empanneled, and the testimony commenced, I was directed by John Everts, another deputy sheriff, to take

one of the jury, by the name of Loomis, to his own house, to see a member of his family, who was sick. I took said Loomis, separately from the rest of the jury, from the court house, to his own house, in Edina Place, from one-half to three-fourths of a mile. When arrived at his house, he left me sitting in the parlor, and went up stairs, and was absent from me ten or fifteen minutes, or more. I did not know who was in the upper story of the house. I then accompanied said juryman back to the Sherman House, where he and I took dinner at the public table. On the next day, the same thing was done again, and the juror remained up stairs the same time as before."

"Ira Snow, being sworn, etc., says: That during the argument of said cause by counsel, one of the jurymen, by the name of Bliss, was separated from the rest of the jury, and left in the court room, while the rest of the jury went to the hotel to dinner, for half an hour or more; that affiant, as deputy sheriff, remained with said Bliss; that when the doors were opened, he put the jurymen in an adjoining room, and that a woman, purporting to be the wife of said Bliss, remained in the court room and conversed with him during the time; that he did not hear them (Bliss and the woman) speak of the case, except as to how long it would probably last; but they talked a good deal together in a whisper, which affiant did not hear and understand."

"Simeon Y. Prince, being sworn, etc., says: He is deputy sheriff of Cook county, and had charge of the jury during the trial of said case. That on the evening of the second day of the trial, at the direction of Mr. Curtis, another deputy, he accompanied one of the jurymen, named Loomis, from the court house to his own house, in Edina Place, from half to three-quarters of a mile; no one else went with us; when arrived at the house, he left me in the parlor, and went up stairs out of my sight, and remained absent about ten minutes, and then came back to me with a woman, who, I was told, was his wife; and after conversing with her ten or fifteen minutes, went back with me to the court house; on the next evening, the same thing occurred again, in the same manner. During the trial, the jury were lodged at the Sherman House (a hotel), in two different rooms, five in one, and seven in the other, in different stories of the house. On one morning, while the said trial was in progress, I accompanied the whole of the jury to the house of said Loomis, and left him there, and accompanied the balance of the jury about the distance of a block, to the house of another juryman; I there waited in front of said house while said last named juryman went in, and was gone out of my sight, in the house, some five minutes; I then went back to the house of Loomis, who was out of my sight and presence about fifteen minutes; no officer accompanied either of said jurymen."

These affidavits are uncontradicted and unexplained, except that the court states, that in consequence of sickness in his family, he permitted the juror Loomis to visit his family, nor does he state that he authorized the juror to go out of the presence and control of the officer of the court, in whose charge he was permitted to visit his sick family. Whatever strictness may have existed in former times, not only in reference to insulating the jury from the outside world, but also in depriving them of the comforts and even necessaries of life, while they had the prisoner in charge, the higher civilization and greater humanity of more modern times, permits the court, in the exercise of a cautious discretion, to provide for the jury every requisite for their comfort and convenience, compatible with a safe seclusion from extraneous influences, and even in case of urgent necessity, the court may be warranted in permitting a juror to be separated from his fellows, so far as to be permitted to visit a sick family, but in such a case, prudence requires that a special order be entered, authorizing the separation, and the juror placed in the charge of an officer of the court, specially sworn to take charge of him, and not permit him to depart from his sight or hearing, and not to converse with him, himself, nor permit him to converse with any other person about the case on trial, during the separation, and return him to his fellows so soon as the object which occasioned the separation, shall have been accomplished.

In the case before us, four of the jurors, upon six different occasions, separated from their fellows, and out of the presence or hearing of any officer of the court, were permitted to hold intercourse with strangers to the court,. and the cause on trial, and there is no pretense that the court authorized or was privy to more than one of these separations, and it does not appear, nor are we to presume, that the court authorized the juror to hold intercourse with others, out of the presence or hearing of an officer of the court. No necessity or occasion for the other separations is pretended.

In *McKinney's Case*, 2 Gilm. R. 553, this court said, " The law in capital cases undoubtedly is, that from the commencement of the trial till the rendition of the verdict, the jury during all the adjournments of the court, should be placed in charge of an officer, unless it is otherwise ordered by the court by the consent of the accused, and the attorney for the People." Again, " In this case, if the jury did separate without the consent of the prisoner, it was an irregularity, and the court below would, upon the fact being established, have been bound to set aside the verdict and grant a new trial, unless such separation was the result of misapprehension, accident or mistake on the part of the jury, and under circumstances to show that

such separation could by no possibility have resulted to the prejudice of the prisoner."

This is from a case where many of the rules and absurd technicalities, in favor of the prisoner, which governed the English courts in the trials of capital cases, are swept away, as not constituting a part of the law under our criminal code, and an opinion by one of the most enlightened and humane judges that ever sat upon this bench, who, while dashing aside with a vigorous hand, but an enlightened discrimination, those senseless technicalities which the sanguinary laws of England extorted from humanity rather than from reason, lays down a rule for the government of juries, which in all times and under all governments, is absolutely indispensable to protect the accused against a whirlwind of passion and prejudice which may be raging beyond the circle which surrounds the court of justice, within which the most calm and solemn serenity and unbiased judgment should alone prevail. If ever the time shall come when juries are not kept entirely separated from, and in utter ignorance of the prejudices and cries of the public, which may call for the blood of a victim, then no man will be safe,—the innocent as well as the guilty is in danger of being tried by a public mob, and condemned, in a frenzy of excitement, where suspicion may be aroused without cause, and culminate into condemnation without reason or reflection. Human passions and prejudices, like fire, increase, rage and intensify by their likes which surround them, and with which they commingle. It is in such times as these that the least contact of the jury with this outside pressure endangers the innocent as well as the guilty. The poison distilled by public prejudice, may, by little more than a moment's exposure, be diffused through the jury room, intimidating the weak and exciting the impulsive. It may be that in this case, there was no outside excitement and no public prejudice, which could have been likely to have communicated itself to the jury on the many and protracted exposures of its different members, which are shown to have occurred. Of this we cannot and would not know anything. As one rule must govern all cases, that rule must be such as not to endanger the innocent, against whom circumstances may excite a strong suspicion and for which public clamor demands a victim. It may be that not in one case in a hundred is there an actual necessity for thus isolating the jury from the outside world, but the hundredth case demands it as much as if the necessity actually existed in every case. The law presumes, and the history of the world shows, that there may be danger of improper influences disturbing the mind of the jury, and hence there can be no

safety unless every case is so tried as to exclude all doubt from such causes.

Important as this case may be to him and to the public, yet the fate of Henry Jumpertz sinks into insignificance compared with that of the thousands of innocent men whose fate may depend upon the rule we are to fix for the conduct of jurors in capital cases. No community can be always exempt from unjust and even absurd excitements, which at the best, will infect the atmosphere of the jury room. And instances have been known where even the equilibrium of courts has been disturbed by such influences. History furnishes a lamentable instance of this in the so called Popish Plot. But fortunately such instances are very rare. Against such hazards no rule of law which may be adopted can effectually protect the innocent.

In the language of Mr. Justice Lockwood, above quoted, if from any cause there is a separation of the jury, it must be " under circumstances to show that such separation could by no possibility have resulted to the prejudice of the prisoner." What are the facts here ? On six different occasions did members of this jury hold intercourse with persons we know not whom, and we are in total ignorance of the nature, character, and extent of the communications which passed at those interviews. Whether the time was spent in imbibing the prejudices which others may have felt towards the prisoner, or in sympathizing and assisting the sick and afflicted at home, we do not and cannot know. The prisoner had no means of informing us for he could not call upon the jurors to disclose what transpired, and the officer of the court, in whose charge the jurors should have continued, and upon whose fidelity and integrity the prisoner must rely, and upon whom he should be enabled to rely with the most sacred confidence,—that officer, we say, was not present to watch over and protect the interests of the prisoner. He whom the law would permit to tell of any misconduct, was not present, and hence could say nothing more than that the jurors were separated, away, and among strangers. They may have been exposed to the most fatal influences. It is not enough to say that the probabilities are that no such fatal mischief was wrought. It possibly might have been. We do not know, and cannot say that it was not. And unless we, from this bench, can tell the prisoner, that during these many interviews with, we know not whom, no harm was done him, nothing was said to his prejudice, no outside influences brought to bear against him, then we are bound to grant him a new trial. We have no warrant for saying this. We cannot so assure him, and hence we must take the other alternative, and allow another jury to pass upon his case. This record also shows, that on some

occasions, at least, some of the jurors were permitted to dine at the public table of a hotel. This cannot be sanctioned by this court, and should not be tolerated by any court.

There are many other points which have been raised by the prisoner's counsel, and discussed with great ability, and most commendable industry, but which we cannot with propriety now stop to examine. Our silence must be understood as approving of the decisions of the Circuit Court thus questioned.

The judgment of the Circuit Court is reversed and the cause remanded, with directions to award a new trial.

*Judgment reversed.*

BREESE, J. I dissent *in toto* from the opinion pronounced by the majority of the court in this case, and will give my reasons therefor, briefly as I may.

The case is one of great public importance, as affecting the security of life, and demands the closest scrutiny. A homicide, unexampled in the annals of any country, has been committed in our largest city, under circumstances of the greatest atrocity, and, under the ruling of the court, the guilty party may go " unwhipt of justice."

But be the guilt of the prisoner of the deepest dye, he is entitled to a fair and impartial trial, and to have the rules of evidence and principles of law properly applied to him, but to no more. He is entitled to all those safeguards, and those only, the beneficence of the law has thrown around the accused, and a full observance of all the necessary and required forms. A serious departure from them, will always justify the interposition of this court, and in a proper case, it will never be invoked in vain.

Could I, for one moment, believe the prisoner had not received a fair and impartial trial, or that the rules of evidence or the principles of law had been improperly applied and enforced, and the required forms disregarded to his prejudice, I should not hesitate to set aside the verdict rendered against him.

The majority of the court, to whose judgment I ought, perhaps, to defer, are of the opinion that such rules and principles have been violated, and they have, as they should do, set aside the verdict, and granted a new trial, and the reasons therefor have been made public. As I dissent from the opinion, it is but respectful that I should give my reasons, although it can produce no practical result. The fiat has gone forth, and the law pronounced for all future time, in like cases, which may hereafter occur.

The opinion of the court is placed mainly on the ground of admitting evidence of comparison of hand-writing, to rebut testi-

mony the prisoner introduced, and which he is supposed to have manufactured, and the separation of several of the jurors at separate times, apart from the officer, but before the case was finally committed to them, and without any proof, or well-founded suspicion even, that the prisoner was prejudiced thereby, together with a half-way objection to certain physical experiments, made with hooks and cords, in the presence of the jury.

As to the first, the court say, " The receipt signed by the deceased, and the letter written by the prisoner, for the purpose of proving, by a comparison of the hand-writing of the two, with the letter produced by the prisoner on the trial, as having been written by the deceased, was not written by her, but was written by the prisoner, was in violation of a well-settled rule of law, and should not have been admitted. The rule that the genuineness of hand-writing cannot be proved or disproved, by allowing the jury to compare it with hand-writing of the party, proved or admitted to be genuine, obtains in criminal as well as in civil cases. The genuineness of a promissory note could not be so proved, though the matter in controversy did not amount to five dollars. Certainly, then, when the life of a human being may depend on the result, the rule of law cannot be less strict. We shall not stop now to discuss the propriety or reason of the rule. It is sufficient that it is well settled, and universally observed."

I will undertake to show, and I think successfully, that the rule of evidence here treated of, is not as stated—is not " well settled," nor " universally observed," and if there be no settled rule on the subject, that the one adopted by the court is not the most reasonable and practical.

It is one of the fundamental rules of evidence, that the best evidence of which the nature of the case or the issue is susceptible, must be produced. The paper, signed by the deceased, was proved to be her hand-writing. About this, there was no dispute. The letter produced by the prisoner, as having been written by her, was introduced by himself, was important to his defense, and it was his business to prove it. No one proved it to be in the hand-writing of the deceased—there was much testimony on the point, but nothing satisfactory elicited, and it was submitted to the jury to determine from the testimony, and the genuine writing, what the probabilities were. So far as this fact was concerned, they were to weigh the evidence, and decide accordingly. Evidence of hand-writing, like all probable evidence, admits of every possible degree, from the lowest presumption to the highest moral certainty, and affects the jury accordingly. All evidence of hand-writing, except when the witness has seen the disputed document actually written, is, in its nature, comparison. It is

only the belief which a witness entertains, upon comparing the writing in question with an abstract picture in his mind, derived from some previous knowledge, and he must, upon the moment, apply that picture or examplar, to the particular writing in question.

The witness who established the hand-writing of the deceased, could refer to that paper when interrogated as to the genuineness of the letter, and he had a right to compare it in his own mind, with the genuine hand-writing, and then speak as to his belief. So had the jury a right, the genuine document being before them, to cherish or reject any belief thus created. It was a collateral matter, and though in a capital case, the jury were not required to be satisfied beyond a reasonable doubt of the truth of every collateral fact that might arise. Upon such, they could weigh the evidence, but upon the whole case, as to the guilt of the accused, they must have no doubt. The question for the jury was,—what is the probability under the evidence? Did the deceased write this letter? It was not a prosecution for forging the letter, but it was a collateral matter, introduced by the prisoner himself, to be disposed of in the same way such facts are always disposed of by courts and juries. The interest the prisoner had in the letter, was one consideration for the jury, and unless he furnished proof of its genuineness, the jury had a right to decide, from the proofs submitted, on its true character, and on the purpose for which it was introduced. It is said to be a general principle, that a witness shall not be allowed to state to a jury, the conclusion or belief of his mind, as to a piece of hand-writing being that of a particular individual, when that conclusion is made for the purpose of the issue, by means of a comparison of the disputed writing with another written specimen of the same individual, produced in court. The reason assigned for this sometimes is, that unless a jury can read, they would be unable to institute a comparison, or judge of the supposed resemblance. A second reason is, that this species of evidence might cause inconvenience, by raising numerous collateral issues, and often come by surprise against the party to be affected by it.

As to the first reason, it is admitted to be too narrow for a rule of such general application.

As to the second, it may be observed, that the issue was presented by the prisoner himself, and he could not complain of surprise.

The strongest reason for rejecting such a comparison is, that the writings intended as specimens to be compared with the disputed paper, would be brought together by a party to the suit, who is interested in selecting such writings only as may

best serve his purpose; and that they are not likely, therefore, to exhibit a fair specimen of the general character of hand-writing. 2 Phil. Ev. 255. But neither of the reasons are approved by Philips, or other respectable writers on the law of evidence.

It is, certainly, an inconsistency in the rules of evidence, to allow a witness to compare, in his mind, the disputed paper, with the impression, which a slight and transient view of writings may have made upon his memory, and on the other hand, not permit the jury to compare it with writings, proved to be authentic, present in court, and open for inspection.

To this objection, which all must see is a valid one, the only answer is, that before suggested, namely, that the writings which are produced as specimens, having been selected by an interested party, to serve a present purpose, may be open to suspicion, and liable to the imputation of contrivance. Phil. Ev. 255.

This is certainly no good answer to the objection, for if they be open to suspicion and liable to the imputation of contrivance, will not the jury, with their argus eyes, and attentive ears, discover it? Why keep it from the scrutiny of a power, in which we glory—in which we repose so much confidence, and on which, courts and the profession are prone to indulge in so much adulation? Can there be any harm or danger in subjecting to the test of a jury, papers open to suspicion and obnoxious to the charge of contrivance? If this was a reason, there is constantly evidence open to the same objection. Other specimens might be exhibited by the opposite party, and means afforded for getting at the truth.

But this rule has been very considerably relaxed, as the same author tells us. Upon a question respecting the identity of hand-writing, the jury may be allowed to take other papers, which have been proved to be the hand-writing of the party whose hand-writing is disputed, provided they are a part of the proofs in the cause, and may compare them with the disputed writing, for the purpose of forming their opinion, whether the disputed writing is genuine. Ib. 256. The reason given is, that the papers being parts of the proofs in the cause, are free from all suspicion of undue selection.

Now I submit, if the paper offered in this cause, is free from the suspicion of undue selection, why should it not go to the jury for the purpose of comparison? Can it be alleged that it is tainted with this suspicion? and if it is, where is the danger of submitting it to the jury?

It is said to be an established qualification of this last rule, that documents irrelevant to the issues on the record, are not to be received in evidence on a trial, for the mere purpose of

27

enabling a jury to institute such a comparison. But the circumstances of this case, show no such state of facts. The question was, is the letter produced by the prisoner, purporting to have been written by the deceased, her genuine hand-writing? No witness proved it was—some one or more thought it resembled her hand-writing. But before the question of the letter had been distinctly presented, the receipt signed by the deceased had been introduced in evidence, by the prosecution. It was not admitted, as alleged in the opinion of the court, for the mere purpose of instituting a comparison of hands, but as a part of the *res gesta*.

A portion of the criminative evidence against the prisoner, consisted in the alleged fact, that the deceased brought with her to the prisoner's room, a considerable amount of money, which was actually deposited to the prisoner's credit, the day after she reached his room, and but three days before her death. To aid the jury in determining whether the amount so brought by her, corresponded with the credit at the bank, the receipt in question, for money paid to the deceased a day or two before, became pertinent and competent evidence.

It was admitted, as a part of the evidence of the witness who had paid her the money, and being in her hand-writing, was the most authoritative evidence of the fact. If the question, touching the genuineness of the letter, had not been raised at all, this receipt would have been introduced to the jury, as part of the *res gesta*, and for a legitimate purpose. When the question of the genuineness of the letter was subsequently raised, *then* it was, that the witnesses were asked, if the disputed letter was in the same hand-writing. And every witness examined on this point, was an expert. It is, therefore, apparent that this evidence is supported by authority. 2 Phil. Ev. 256.

But I insist, that it was admissible, on the clearest principles of reason and authority, for the purpose of instituting a comparison of hands, by experts, and that it was not necessary that the evidence should have been in the case, for any purpose except that of making the comparison.

It has been already stated, that a witness who testifies on the subject of hand-writing, gives, at best, but the result of a mental comparison, made by him, of the disputed writing with that which he has seen, and the impression of which remains on his memory. What difference could it make, if this comparison was carried on in the mind, which the rules of evidence allow, or actually made in the presence of the court and jury? Is speaking from an impression made on the mind, more convincing, more worthy of regard and belief, than a present conviction, produced by actual comparison?

Starkie says, (2 Stark. Ev. 516), the most satisfactory reason for excluding comparison of hands is, that if such comparison was allowed, it would open the door to the admission of a great deal of collateral evidence, which might go to a very inconvenient length.

This reason does not seem to me, either powerful or convincing. The examination is always in the power of the court to be arrested, when proceeding to an inconvenient length. But the reason does not apply here, for the genuineness of one single document only, was in question, and that produced by the prisoner himself. Starkie, however, leans in favor of the evidence.

In *Allesbrook* v. *Roach*, 1 Esp. R. 351, sittings after the term at Winchester, before Lord Kenyon, that distinguished judge said, on the comparison of hands: " Some judges have doubted of the policy of that rule of evidence, respecting the allowing of the jury to judge by comparison of hands, because often at a distance from the metropolis, the jury are composed of illiterate men, incapable of drawing proper conclusions from such evidence. For my part, I have been always inclined to admit it, and shall do so in this case."

A distinction seems to be taken by the learned judge, when a *witness* is called to speak from comparison of hands. He is held not to be admissible, (ib. *Stranger* v. *Searle*, 14, per Lord Kenyon,) but the jury can be allowed to make the comparison, and no good reason has ever been assigned, or can be assigned against it. The jury want evidence to satisfy them of the probable truth of a fact, and if the best evidence of which the case or the issue is susceptible is produced, the requirement of the law is fulfilled.

In more recent English cases the doctrine is thus laid down—as I have already stated—that the court or jury may compare two documents together, when properly in evidence, and from that comparison, form a judgment upon the genuineness of the hand-writing. 4 Phil. Ev., Cowen and Hill's notes, part 2, page 478. This being so, why is it not as reasonable, when a doubtful paper is sought to be made evidence, that the opposite party should show by a genuine paper, and by comparison of the disputed paper with it, that the probability is against its genuineness. The evidence may not be conclusive by any means, yet it affords the jury some *data* on which they can make up a satisfactory opinion for themselves.

I am of the opinion, that were the paper the ground of the action, as upon an indictment for forging it, the evidence would be admissible, although in criminal prosecutions of that nature, the jury must be satisfied beyond a reasonable doubt of the truth of the forgery. They cannot in such case weigh the evidence

and find their verdict on probabilities. But the purposes of the proof in this case were wholly different. The question was, is this letter the genuine letter of the deceased. This is met by an exhibition and proof of her genuine hand-writing, and by the testimony of witnesses who fail to identify the letter, some of whom, on comparison, condemn it. They are submitted to the jury for the purpose of satisfying them on that point, and they condemn it. The theory of the prosecution was, that the letter was a forgery got up by the prisoner, in anticipation of the occasion, and the prosecution were entitled to use all the means at their command to raise the presumption that it was a forgery, and none were more proper than by the production of a genuine paper, and comparing the forged one with it.

The rule on this subject is by no means uniform in the several States of the Union.

In Pennsylvania, in the case of *McCorkle* v. *Binns*, 5 Binney, 349, after evidence was given in support of a writing, it was permitted to corroborate by comparison with an acknowledged writing of the party. In *Farmers' Bank of Lancaster* v. *Whitehill*, 10 Serg. and Rawle, 112, the court in discussing the reasons above given, for the rule, consider them all unsound and unsatisfactory. That court says, it is more satisfactory to submit a genuine paper, as a standard, and let the jury compare that with the paper in question, and judge of the similitude, than the evidence continually received of allowing a witness who has seen the party write once to compare the disputed paper with the feeble impression and transient view the writing may have made upon his memory. This is by no means so well calculated to ascertain the truth, the object of all evidence, as to suffer the jury to compare the paper with writings proved to be authentic present in court and open for inspection.

The court cites the case of *Osborne* v. *Hosier*, 6 Modern, 147, where one of the subscribing witnesses on the issue of *non est factum*, gave full evidence of sealing and delivery. The other swore it was very like his hand, but not his. The reputation of both was good, and Holt, C. J., ordered them to write their names, and thereupon left it to the jury, who found for the plaintiff. See also *Baker* v. *Haines*, 6 Wharton, 284. On an indictment for forgery, especially where the writing is found in the prisoner's possession, comparison of hands may be permitted. *Pennsylvania* v. *McKee*, Addison's Rep. 33.

In North Carolina, comparison of hands is admissible as a circumstance in aid of doubtful proof, but *per se*, and without other proof, it is not. *Bowman* v. *Plunkett*, 2 McCord, 518.

In New Hampshire, the doctrine of the Pennsylvania courts is established. *Myers* v. *Toscan*, 3 N. H. R. 47. So in Massa-

chusetts. *Hall* v. *Huse*, 10 Mass. R. 39; *Homer* v. *Wallis*, 11 Mass. R. 308.

In Kentucky, it is held that such proof is inadmissible except in the case of ancient writings, and in aid in corroboration of other proof. But alone, and without other proof, the general rule is not to admit it. *Woodward* v. *Spiller*, 1 Dana, 179.

In Maine, it is held admissible. Hammond's case, 2 Greenl. R. 33. So in Connecticut. *The State* v. *Nettleton*, for forgery, 1 Root, 308; and in *Lyon* v. *Lyman*, 9 Conn. R. 55; and no distinction is made between civil and criminal cases. And in Pennsylvania. *Commonwealth* v. *Smith*, 6 Serg. and Rawle, 571. And so in Rhode Island. *Freelove* v. *Fenner*, 2 Gallison, 170.

In Louisiana, the doctrine on this subject rests on their code of practice, and proof by comparison is allowed. In 2 McNally's Evidence, 394, it is said that in proving the hand-writing of a defendant, there is no distinction between that which is legal evidence in a civil action, and that which is legal evidence in a criminal prosecution. The rule adopted by this court, then, cannot be said to be " universally observed."

But this review of authorities was unnecessary, inasmuch as this court, in the case of *Pate* v. *The People*, 3 Gilm. R. 659, declared the rule to be as I have stated it.

That was an indictment for forging a receipt, and a contract for the conveyance of a tract of land. On the trial, one Phillips, an expert, who had never seen the party write, was called to give his opinion upon the papers produced, whether they had been altered or not from the originals.

The first error assigned was in receiving the testimony of Phillips. Treat, J., in delivering the opinion of the court, says, " A bare reference to the testimony which he gave and the object for which it was introduced, will clearly show there was no valid objection to it. Randall the prosecuting witness testified that the receipt and contract described in the indictment, were never executed by him, and he proceeded to point out instances wherein the style of writing and spelling differed from his own. For the purpose of contradicting him, the prisoner introduced other papers, written and signed by Randall, which corresponded in these particulars with the documents alleged to be forged. The prosecution then had the undoubted right to rebut this testimony and sustain Randall. A legitimate way of doing it was by showing that the papers introduced by the prisoner and which by the evidence had been traced to his possession previous to the trial, were originally written as stated by Randall, but had since been made to resemble the forged writings by alterations and erasures. Phillips was placed on the stand for the purpose of examining them critically,

and then expressing his opinion to the jury, whether there had been such erasures or alterations. His conclusion was that erasures had been made in the particular instances pointed out by Randall. It had been the business of the witness for many years, as an officer of a bank, to examine papers with a view of detecting alterations and erasures, and ascertaining spurious from genuine writings and signatures. He was therefore a person skilled in the matters concerning which he was called to give testimony, and as such, was competent to express his opinion to the jury.

" It was insisted on the argument, that the question whether there had been erasures, was one to be determined by the jury on an inspection of the papers, without the aid of other testimony. It can hardly be supposed that the jurors were as competent to form a correct opinion on the subject, as a witness peculiarly qualified by years of practical experience. Erasures might be easily discovered and pointed out by such a witness, which would otherwise escape the observation of men unaccustomed to detecting them. The court was right in allowing the minds of the jury to be enlightened by the opinion of a witness possessing this superior knowledge."

This ruling, I submit, covers the whole ground for which I contend. Here is comparison of hands by an *expert* who had never seen either party write, and it was right and proper that the minds of the jury should be " enlightened " by his opinion.

Upon the other point of physical experiments having been made in view of the jury, in the absence of the court, and also in the presence of the court, I am well satisfied there was no impropriety in it. The great object of testimony is to get at facts, and it matters not by what avenue they reach the mind of a jury, whether by the eye or the ear. The experiments involved no question of science or skill, and the jury might as well see them with their own eyes, as to have a detail of them by witnesses when made out of their sight. About the propriety of this mode of getting facts there is no question. *Vaughn* v. *The State of Mississippi*, 3 Smead & Mar. R. 555 ; *Colt* v. *The People*, 3 Hill R. 437, note (a), and other cases referred to on the argument. Such experiments, properly conducted, afford evidence of the most satisfactory and conclusive nature.

As to the irregularities in permitting several of the jurors, each one by himself, to separate from their fellows for a few minutes, it may be admitted, it was irregular so to do, and the officer should be punished for suffering it. But such separation, under the circumstances detailed in the record ought not to be held as vitiating the verdict. There should be some proof,

some reasonable suspicion at least, that such separation was to the prejudice of the prisoner.

The case of *The State* v. *John Tilghman*, on trial for murder, reported in 11 Iredell N. C. R. 513, is a very strong case to show that very great irregularities on the part of a jury, are not compulsory on the court to set aside a verdict, and tho' going perhaps too far, furnishes strong evidence of the unwillingness to disturb a verdict.

In *Smith* v. *Thompson*, 1 Cowen R. 221, where two jurors, after the jury retired to consider of their verdict, separated from their fellows, and were gone some hours, but returned and joined in the verdict, the court refused to set aside the verdict, there appearing to have been no probability of abuse. In all the cases I have examined, and they are numerous it is settled, that in order to set aside a verdict on the ground of the separation of the jury, there must be some suspicion of abuse. See *Beebe* v. *The People*, 5 Hill R. 32.

There is not the slightest imputation upon any one of the jurors who separated in this case. In passing their houses, in company with the sheriff some one or more went in, and were out again immediately. This was before the trial closed. They had not retired to consider of their verdict. Under such circumstances in the absence of all proof, or suspicion even, that the prisoner was prejudiced in any way by it, to set aside a verdict, after a fair trial seems to me going much too far.

How is it that the greatest criminals are treated with the greatest lenity and every inference indulged in their favor? The answer is it is *in favorem vitae*, but has that sentiment any influence over the remorseless murderer? Why should this court say, in such a case as this is, that it is within the reach of possibility the separating jurors, in the few brief moments they were absent from their fellows, *may* have been tampered with, or otherwise prejudiced against the prisoner? Is it right, is it a demand of justice, that courts should fly to such *possibilities.* The apprehensions of popular excitement, demanding its victim, are all imaginary. The day of popish, and all other plots of a kindred character, have long since passed away. Trials for witchcraft and sorcery, where victims were yielded up to popular clamor, marked an uneducated and superstitious age. They are with the past, never to be revived in the clear sun-light of advanced education, and the highest civilization. Our history furnishes no instance, since these dark days, where an accused person, under a formal trial, has been taken from the courts, and victimized by the people, or his conviction obtained by the demands of an excited populace.

If there was any reason on the earth to suspect that the prisoner had not been fairly treated by the separating jurors, that they had talked about his case, or received improper or any impressions in regard to it, or that he had not a fair trial, I should be the last one to insist upon the verdict. But there being no pretense of this sort and a fair trial had, he is entitled only to strict justice.

In a murder case in Connecticut, *The State* v. *Babcock*, 1 Conn. R. 401, the court say a judgment will not be arrested, merely because the jury, after the cause was committed to them, separated before they had agreed upon a verdict.

I can find but one case in the books, where *mere* separation of the jury has been held sufficient cause for setting aside a verdict, either in a civil or a criminal case. That case is *The Commonwealth* v. *McCaul*, 1 Virginia Cases, 271, where the court go the length of saying that the court should guard against the *possibility* of abuse by setting aside the verdict if any of the jury depart from the control of the officers. In England, where great strictness is observed the decisions are uniform, that though the jury separate, if there be no further abuse, this shall not vitiate the verdict, though it would be a contempt of the court if contrary to their instructions, and would be punished as such. In the case of *The People* v. *Douglas*, 4 Cowen, 34, the whole doctrine is fully examined. In that case it was shown, that two of the jurors ate cakes and drank spirituous liquors, and talked about the trial, and *for these reasons*, not for the *separation alone*, the verdict was set aside.

There is not a scintilla of evidence, going to show or to raise a suspicion, that any one of these jurors ate or drank or talked about the case, or had any intercourse with any person where such conversation would be likely to take place. Nothing of the kind is pretended or shown, and as the separation occurred before the case was finally committed to them, it is going further than I think the court should go, to hold it such an irregularity as to vitiate the verdict.

A bare possibility that the jurors separating might have been tampered with, or improperly influenced has never before in any court, except the solitary case of *McCaul*, been held sufficient to set aside a verdict. The books will be searched in vain for such a case. Mere separation, before the case is finally committed to the jury, unaccompanied with proof of exposure to improper influences, or just suspicion thereof, I repeat, has never until now, been held to vitiate a verdict.

Should such a criminal escape, the justice of the State might be well impeached. *"Judex damnatur, cum nocens absolvitur."*

There is not in my judgment a single prominent fact in this case, consistent with the innocence of the prisoner, but

> "In law, no plea so tainted or corrupt,
> But, being seasoned with a gracious voice,
> Obscures the show of evil."

His counsel, who have managed this case with signal ability, have argued his innocence, as it was their duty to do. There is in every mind, a strong tendency to weave for itself a theory out of the minute incidents surrounding a transaction, itself shrouded in some mystery, and to bend everything to its support; it is not strange therefore, that able and enlightened counsel, having been assured of the fact itself by their client as he desires to establish it, should find in everything, a tendency to prove their theory true. As a judge, and disinterested, I can discover nothing on a careful examination of the evidence, on which to base their theory. Could I do so, and did I believe the prisoner had not a fair and impartial trial, I would not hesitate to award him another trial. I believe he has had a fair and impartial trial, and I further believe, that no rule of evidence, or principle of law, has been improperly determined against him; and therefore I think the verdict should stand.

*Judgment reversed.*